UNITED STATES of America,
Plaintiff-Appellee,

v.

Donald JAMES and David Anthony
Butler, Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Henry SMITH and Kenneth Wayne
Whitmore, Defendants-Appellants.

Nos. 77–5188, 77–5271.

United States Court of Appeals,
Fifth Circuit.

July 20, 1978.

Rehearing En Banc Granted
Aug. 7, 1978.

Frank Joseph Petrella, Atlanta, Ga., for Donald James.

David Anthony Butler, pro. se.

P. Bruce Kirwan, Federal Public Defender, John R. Martin, Asst. Federal Public Defender, Atlanta, Ga., for Henry Smith.

Murray M. Silver, Atlanta, Ga., for Kenneth W. Whitmore.

William L. Harper, U. S. Atty., William L. McCulley, Atlanta, Ga., Ann T. Wallace, Joseph S. Davies, Jr., Katherine Winfree, Attys., Dept. of Justice, Appellate Section, Criminal Div., Washington, D. C., for plaintiff-appellee.

Before TUTTLE and CLARK, Circuit Judges and EDENFIELD,* District Judge.

TUTTLE, Circuit Judge:

These appeals arise from two separate trials but involve the same alleged conspiracy, revolving around Fred Hill in Atlanta, to bring in heroin and cocaine from California for distribution in Atlanta and Philadelphia. Appellants James and Butler, who were tried first along with four other co-defendants, were convicted of conspiracy to possess heroin and cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846, but the jury was unable to reach a verdict as to Smith and Ernestine Bassey, the alleged California supplier. The court granted a motion for acquittal for one codefendant, Constance Smith (appellant Smith's daughter), and the jury acquitted Cheryl Dumas. A month later Smith was retried along with appellant Whitmore, who had failed to appear for the earlier joint trial. At the second trial, both Smith and Whitmore were convicted on the same charge as Butler and James, and all four appeal.

## I. The Conspiracy

The evidence at both trials established that Hill obtained heroin from sources in California. Johnny Mack Gordon, an unindicted co-conspirator who testified for the prosecution, assisted Hill in distributing heroin from Hill's white Mercury Comet "stash" car, which was parked at Gordon's apartment. Gordon made deliveries to several people in Atlanta, as directed by Hill, and he collected $1,000 to $1,200 per one-ounce package when Hill told him to do so. Gordon had no personal knowledge that the packages contained heroin, but he said that Hill referred to the substance as "boy," a nickname for heroin. Gordon described the contents of the packages as a brown powder and "guessed" that it was heroin. When Gordon first began making deliveries for Hill early in 1974, the trunk contained 25 one-ounce packages. It was refilled on two later occasions, both times after Lillian Pee-

ples, an unindicted co-conspirator, had transported drugs to Atlanta from California. The last supply was seized when Gordon was arrested in August 1974. Laboratory reports showed that the trunk of the stash car contained 44 ounces of heroin and three ounces of cocaine. Other drug paraphernalia were also seized. The jury was justified in inferring that the packages delivered by Gordon for Hill in Atlanta contained heroin and that it came from California.

There was also testimony from which the jury could conclude that Hill supplied heroin for distribution in Philadelphia. Marlene Cochran, an unindicted co-conspirator, testified that she flew to Atlanta from Philadelphia around New Year's Eve in 1973 with James and another individual. She and James received heroin from Hill, who took it from the trunk of a white Ford or Mercury parked in an apartment complex. Cochran repackaged the heroin at James' direction and carried it back to Philadelphia for James. We conclude, then, that the existence of the conspiracy alleged in the indictment was proved beyond a reasonable doubt.

We turn now to a consideration of each appellant's role in the conspiracy. The facts relating to each appellant's alleged participation are largely uncontested because none of them chose to offer any evidence in their defense. We must decide whether the evidence presented by the government was sufficient to support the convictions and whether one conspiracy or more were shown. Certain other issues, including a reconsideration of our court's treatment of the so-called co-conspirator hearsay exception, are also raised and are discussed below.

## II. Sufficiency of the Evidence

We are compelled, of course, to view the evidence on appeal from a jury verdict of guilty in the light most favorable to the government and to accept all reasonable inferences and credibility choices which will

* United States District Judge, Northern District of Georgia, sitting by designation.

uphold the verdict. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

### A. James

In addition to the evidence already mentioned above concerning James' role in transporting heroin from Hill in Atlanta to Philadelphia, Cochran also testified that on a later occasion when she was staying at Smith's house in Atlanta, Hill called from Ohio looking for James because Hill had a package for him. Hill wanted James to pick it up so he could get it on the streets.

■ We believe that these two incidents are sufficient to support the jury's verdict of guilty beyond a reasonable doubt. James argues that Hill on one occasion went into a separate room to discuss a drug deal with Patrick Gonsalves, an unindicted co-conspirator, and that this proves that James was not privy to Hill's conspiracy. However, it is well settled that a conspirator need not be involved in every transaction comprising the conspiracy in order to be convicted. *United States v. Becker*, 569 F.2d 951 (5th Cir. 1978).

### B. Butler

The most damaging evidence against Butler came from two witnesses: Gordon and Gonsalves. Gordon described two occasions on which he delivered one-ounce packages of heroin to Butler at his home in Decatur. Gonsalves testified about two incidents both of which link Butler to the drug distribution conspiracy. Gonsalves was present at Butler's home one time when Hill came over with two ounces of heroin for Butler so that Butler could strengthen an earlier delivery which had been overcut. Hill cut and bagged cocaine in Butler's presence. On another occasion Gonsalves met with Hill and Butler at a friend's apartment. Hill, who had a new shipment of heroin contained in three large bags, gave a small amount to Butler as a sample. This evidence is clearly sufficient to prove Butler's knowing participation in the alleged conspiracy.

### C. Whitmore

The two main witnesses against Whitmore were Gordon and Gonsalves. Gordon testified that Whitmore had approached him at the airport where Gordon worked during the late spring or early summer of 1974. Whitmore told Gordon that he had discussed a transaction with Hill and wanted to get in touch with him. Hill was out of town and could not be reached. So Gordon drove with Whitmore to Gordon's apartment and left Whitmore in front while Gordon went to the stash car parked in the back, got two ounces of heroin, and delivered them to Whitmore. Gordon, who stated that he never told buyers where the stash car was located, did not take Whitmore to the car or tell him where it was. Gordon did not get any money from Whitmore because Whitmore did not say what arrangement he had made with Hill for payment. Gordon testified that he did not normally make deliveries without Hill's authorization, but he did so on this occasion because Whitmore said "it had been pre-arranged, and I couldn't get in touch with [Hill]; I went ahead and did it." This incident constitutes the only nonhearsay evidence tying Whitmore to the conspiracy.

When Hill returned in a couple of days, Gordon told him what had occurred in his absence. Hill said Whitmore had lied to Gordon, that he had made no such agreement with Whitmore before he left, and that Gordon should not have done it. Hill also told Gordon that Whitmore already owed Hill money.

Gonsalves testified that he frequently purchased heroin from Hill either directly or through Gordon and that Hill had agreed to sell to Gonsalves through Gordon when Hill was out of town. In the summer of 1974 Hill asked Gonsalves if he had seen Whitmore. Hill said that he was looking for Whitmore because he had given him five ounces of heroin for which he had not been paid and that when Hill was out of town Gordon had given him five more ounces for which Hill had also not been paid. Gonsalves described Hill as angry. A few days later Hill told Gonsalves that he had

seen Whitmore and had gotten his money. On cross-examination Gonsalves said that he did not know whether Whitmore was working with Hill and that he did not believe that the two worked together on getting drugs from California. Gonsalves had told the grand jury that Hill and Whitmore had separate California connections.

■ The only other evidence which related directly to Whitmore involved his failure to appear for trial on the date originally set. A police officer testified that he had arrested Whitmore in Los Angeles pursuant to a warrant issued after Whitmore's failure to appear. Whitmore denied his identity and had another person's driver's license in his pocket. This evidence was properly introduced to show flight and a guilty mind. *United States v. Alonzo*, 571 F.2d 1384 (5th Cir. 1978).

■ Although Whitmore argues that the independent nonhearsay evidence against him is insufficient to link him to the conspiracy, we disagree. Whitmore's own statement to Gordon, as related in Gordon's testimony, provides proof of all of the essential elements of the conspiracy charged. Whitmore's statement, admissible against him as an admission of a party opponent under Fed.R.Evid. 801(d)(2)(A), clearly demonstrates the existence of a consensual agreement between Hill and the appellant. Whitmore's discussion with Gordon also establishes that Whitmore knew that Gordon worked for Hill in distributing heroin. By arranging to deal with Hill and then consummating this deal through Gordon, Whitmore joined the conspiracy. Granted, he may not have been one of the key members, but his role was sufficient to sustain his conviction. It was not necessary for the government to prove that he participated in every aspect of the conspiracy, *United States v. Rodriquez*, 509 F.2d 1342 (5th Cir. 1975), so Gonsalves' testimony that Whitmore may not have been involved in the California aspects of the scheme cannot help Whitmore. Hill's statements to Gonsalves suggest that Whitmore had dealt previously with Hill, thus establishing continuity of the relationship.

### D. Smith

The evidence against Smith came mainly from Cochran, an unindicted co-conspirator who lived in an apartment rented from Smith. As mentioned earlier, Cochran had been involved with James in transporting heroin from Hill to Philadelphia early in 1974. She did not implicate Smith in that transaction.

Smith owned a home in Atlanta, and Cochran made several trips to Atlanta in 1974 to fix up Smith's house or to watch his children. On the last trip to which she referred, in November of 1974, she stayed at Smith's house for two weeks. Smith was present during at least part of this time. It was during this visit that Hill called Smith's home asking her if she had seen James. Hill also asked for Smith but he was not there. Hill called back three or four times and talked to Smith. Cochran heard Smith say that he had not seen James. Later Smith told her about his phone conversations with Hill. Hill had said that he had a "package" for James in Ohio which James was supposed to pick up. When James could not be located, Smith finally agreed to take the package himself. Cochran was to go to Ohio for it until Smith learned that Hill wanted $2,000 for it. Because Smith did not have the money in Atlanta, he called his daughter in Philadelphia and instructed her to get the money and go to Ohio for the package. Cochran said that she understood "package" to mean heroin.

Cochran also testified that she and one Earl worked for Smith in Philadelphia selling heroin from Smith's or her apartments, mostly to users. During Cochran's November visit to Atlanta, Earl called from Philadelphia and told her that they were out of "stuff," meaning heroin, in Philadelphia. Cochran told this to Smith.

On cross-examination Cochran was impeached on the basis of prior inconsistent statements made at the first trial. At that time, she had not been able to say when she had been in Atlanta. She was also a former heroin addict and she was granted immunity for her testimony.

Smith argues that the transaction with Hill was an afterthought and that it does not support the conclusion that he was a member of the conspiracy. Perhaps he was not—until then. But once he formed this agreement with Hill, he entered the conspiracy. He must have known about Hill's operation and that others, James, for example, were involved in it. In short, his conviction must stand.

### III. Multiple Conspiracies

■ The appellants, by isolating each of the transactions described above, argue that multiple conspiracies were proved rather than the one alleged in the indictment. This argument is without merit. The existence of multiple conspiracies is a fact question for the jury, *United States v. Becker, supra,* and there is ample support in the record for the jury's conclusion that the appellants were members of the one conspiracy alleged. Each appellant dealt with Hill or Gordon under circumstances which clearly demonstrated their knowledge of the fact that Hill's operation encompassed more than just Hill. Each member of the conspiracy need not be familiar with all of the details of the illegal scheme as long as he knows its general scope. Nor is it necessary for all of the co-conspirators to know each other or to work together on every transaction. *United States v. Rodriguez, supra.*

We are convinced that the government's proof sufficiently established that Hill's drug distribution operation was a unified scheme in which all appellants joined. The evidence showed overlapping membership in the various transactions and a centralized operation aimed at the specific objective of supplying drugs in large enough quantities and of a sufficient strength to permit further distribution. The jury was properly instructed on this issue, notwithstanding James' argument to the contrary. Because we hold that only one conspiracy existed, there was no error in denying the appellants' motions to sever.

### IV. Miscellaneous

■ Two other issues raised by James and Butler do not merit much discussion. They argue that the court erred in refusing to permit defense counsel to examine Cochran's arms for evidence of recent drug addiction. This restriction on cross-examination was not error for several reasons. First, testimonial cross-examination was adequate to impeach the witness, who readily admitted her prior drug addiction, including addiction during some of the incidents about which she testified. The jury was fully aware of this fact and was free to assess her credibility as it saw fit. Second, limitations on the extent of cross-examination lie within the sound discretion of the trial court, and no abuse of discretion has been shown. Third, defense counsel did not establish any qualification as experts in identifying recent drug addiction by an examination of an addict's arms.

■ James and Butler also argue that the court erred in admitting records of telephone calls made from Smith's residence to Ohio because the records were not properly authenticated. This issue occupied a great deal of attention in the court below. The original records were destroyed as part of the telephone company's normal destruction policy, and no company employee was able to state from personal knowledge that the government's copy was a true and accurate copy of the originals. However, even if the authenticity of the records was not adequately established, admission of the records was harmless error as to James and Butler. Neither was a party to any phone calls from Smith's home, and Butler was not even mentioned in connection with any phone calls. The records related to outgoing calls and James was mentioned only in connection with incoming calls.[1] Hill had asked about James' whereabouts when he called Smith's residence, and Cochran's testimony clearly established this fact. We

1. At Smith's second trial the court refused to admit the records because the testimony relating to Ohio phone calls referred only to incoming calls, whereas the records related solely to calls made from Smith's house.

fail to see how the admission of the records could have harmed either appellant.

## V. Coconspirator Statements

The final issue in this appeal requires us to consider the effect of the Federal Rules of Evidence upon the previous law regarding the allocation of the functions of judge and jury in determining the admissibility of extrajudicial statements under the so-called coconspirator exception to the hearsay rule. We expressly reserved decision on this issue in two recent cases because the issue had not been raised in the district court. *United States v. Hansen*, 569 F.2d 406 (5th Cir. 1978); *United States v. Tenorio*, 565 F.2d 943 (5th Cir. 1978). In this appeal, however, the appellants moved for a pretrial hearing outside the presence of the jury in order to permit the trial judge to determine the admissibility of coconspirator statements. In support of their motion, they argued that Rule 104(a) of the Federal Rules of Evidence allocated to the judge alone the responsibility for deciding the admissibility of such statements and that the complexity of their case called for this to be accomplished at a separate nonjury hearing, as permitted under Rule 104(c). The district court denied the motion, asserting that cautionary instructions of the kind required in *United States v. Apollo*, 476 F.2d 156 (5th Cir. 1973), would adequately protect the defendants. Faced with this denial of their motion, the defendants requested and received *Apollo* instructions at trial. They now ask us to reverse their convictions on the basis of the denial of their motion. We believe this is an appropriate opportunity to revisit *Apollo* and to establish the correct standard and procedure for handling the admissibility of coconspirator statements in criminal conspiracy trials. Applying this newly formulated standard to the appellants, we nonetheless affirm their convictions.

 Under a long-recognized exception to the hearsay rules, a statement made by one member of a conspiracy during the course of and in furtherance of the conspiracy may be used against other members of the conspiracy if certain conditions are met. Present practice calls for the judge and the jury to share the responsibility for determining whether these conditions have been met. We have held that the judge's role is to make a preliminary determination whether the government has presented sufficient evidence, independent of the hearsay itself, to support a finding by the jury that the alleged conspiracy existed and that the declarant and the defendant against whom the statement is offered were members of that conspiracy. This is the "prima facie case" standard enunciated in *United States v. Oliva*, 497 F.2d 130 (5th Cir. 1974), and followed in subsequent decisions. *See, e. g., United States v. Rodriguez*, 509 F.2d 1342 (5th Cir. 1975); *United States v. Tyler*, 505 F.2d 1329 (5th Cir. 1975). If the judge is satisfied that this test has been met, then under *Apollo* and other cases, the jury is instructed, both when the hearsay is introduced and at the final charge, that it may consider the hearsay as against a particular defendant only if it first finds that the conspiracy existed, that the declarant and the defendant were members of it, and that the statement was made during the course of and in furtherance of the conspiracy. *See, e. g., United States v. Lawson*, 523 F.2d 804 (5th Cir. 1975); *United States v. Fontenot*, 483 F.2d 315 (5th Cir. 1975); *Myers v. United States*, 377 F.2d 412 (5th Cir. 1967). However, the cases are uniformly silent on the standard which the jury is to apply to its initial determination. Apparently it is not uncommon for the jury to be instructed that it must find the existence of the conspiracy and the defendant's connection to it beyond a reasonable doubt before ever considering the coconspirator hearsay.[2] Obviously, this renders the hearsay totally superfluous, for, if we assume that the jury complied with the instructions, the hearsay evidence was not available to the jury until it had already found the defendant guilty beyond a reasonable doubt. This flows from the fact that the preliminary facts necessary for admissibility coincide with the ultimate facts necessary for conviction; *i. e.* the existence of

---

**2.** That was the instruction given in this case.

the conspiracy and the membership of the accused in it.

 Under the Federal Rules of Evidence, which became effective July 1, 1975, a statement is not hearsay if it is offered against a party and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R.Evid. 801(d)(2)(E). While this definitional section of the Rules removes coconspirator statements from the realm of hearsay, admissibility still depends upon the proof of the same facts as previously. Thus, there must be a conspiracy, the statement must be made during the course of and in furtherance of the conspiracy, and the declarant and the defendant must be members of the conspiracy.[3] However, Rule 801 provides no guidance on whether the judge or the jury is to decide that these conditions have been satisfied.

To resolve that question, we must look to Rule 104, which seeks to delineate the functions of judge and jury in the determination of preliminary questions of fact. The relevant portions of Rule 104 provide:

(a) Questions of admissibility generally. Preliminary questions concerning the qualifications of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

(b) Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

(c) Hearing of jury. Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be so conducted when the interests of justice require or, when an accused is a witness, if he so requests.

The rule thus adopts the orthodox position that the judge alone decides preliminary questions which relate to the competence of evidence and the jury decides preliminary questions which relate to the conditional relevancy of the evidence.[4]

The language of Rule 104 does not conclude our inquiry, however, for neither that rule nor the Advisory Committee's Notes informs us whether coconspirator's statements are to be dealt with under Rule 104(a) as questions of competence or under Rule 104(b) as questions of conditional relevancy.[5] As Weinstein has observed,

The problem can, on the one hand, be characterized as a matter of competence of the evidence—i. e. is the probability of its reliability sufficiently great to make it admissible? Viewed from this perspective the preliminary issue of the existence of the conspiracy and the objecting defendant's part in it are questions for the judge to decide like any other question of hearsay or privilege.

But, on the other hand, the issue can be framed in relevancy terms where the question of admissibility turns on the relevancy of the evidence. Thus declarations of a coconspirator, while often interesting, are largely irrelevant to any issue of defendant's guilt unless he is first shown to be connected with the conspiracy. Preliminary questions regarding relevance are frequently held to be for

---

**3.** The Supreme Court has stated that the rationale behind the coconspirator rule is the notion that coconspirators are partners in crime and the law deems them agents of one another. The "in furtherance of the conspiracy" requirement is analogous to the agency theory of "in the scope of the agent's authority." *Anderson v. United States*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974).

**4.** For an early yet authoritative explication of the orthodox rule and its variations, *see* E.

Morgan, *Functions of Judge and Jury in the Determination of Preliminary Questions of Fact*, 43 Harv.L.Rev. 165 (1929).

**5.** Compare L. Kessler, *The Treatment of Preliminary Issues of Fact in Conspiracy Litigations: Putting the Conspiracy Back into the Coconspirator Rule*, 5 Hofstra L.Rev. 77 (1976), with P. Bergman, *The Coconspirator's Exception: Defining the Standard of the Independent Evidence Test under the New Federal Rules of Evidence*, 5 Hofstra L.Rev. 99 (1976).

the jury after the introduction of sufficient evidence to justify a jury finding the existence of the preliminary fact. M. Berger & J. Weinstein, Weinstein's Evidence ¶ 104[05] at 104–40 (1975).

Clearly we must look beyond the language of Rule 104 to its underlying policies in order to determine who should decide the preliminary questions and what standard of proof should control the decision on admissibility. This inquiry begins with a recognition that the danger sought to be avoided is the prejudice to the defendant which would result if the jury were to rely upon coconspirator statements without first addressing and deciding the admissibility question. It was this same danger which motivated the Supreme Court to hold in *Jackson v. Denno,* 378 U.S. 368, 391, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), that a criminal defendant was entitled to have a "reliable and clear-cut determination of the voluntariness of [his] confession, including the resolution of disputed facts upon which the voluntariness issue may depend," made by someone other than the jury which was to determine his guilt or innocence.[6] The Court was concerned that the jury's determination of voluntariness would be influenced by its belief that the confession, even though coerced, was true. A procedure which permitted the same jury to resolve both the voluntariness issue and the defendant's ultimate guilt left an appellate court unable to determine how the jury had resolved these issues. Expressing the view that a jury simply could not perform the two-step analysis without being swayed by the content of the confession, the Court refused to "assume that [the issues] were reliably and properly resolved against the accused." *Id.* at 387, 84 S.Ct. at 1786.

The same risk of prejudice to the defendant against whom coconspirator statements are proffered calls for a procedure which will minimize the possibility of a conviction based even in part on inadmissible evidence. We believe that it is unrealistic to assume that a jury will always engage in the two-step process of determining admissibility and then guilt. It is entirely likely that the jury will be so affected by the content of the very statements whose admissibility they are considering that the issue of admissibility will never actually and finally be resolved. Nor is a defendant adequately protected by the judge's preliminary determination that the government's proof is adequate to support a jury finding of the fulfillment of all of the conditions. This was the practice challenged in *Jackson v. Denno, supra,* with regard to confessions. Yet the Supreme Court found it no substitute for an actual, full, clear-cut, and reliable determination.

We are convinced that the preliminary questions of conditional relevancy envisioned by Rule 104(b) are those which, by their very nature, present no such danger of prejudice to the defendant. They are questions of probative force rather than evidentiary policy. They involve simple factual questions which the jury, with its own common sense, can answer as capably as the trial judge. In such situations an instruction to disregard the evidence if the condition upon which relevancy depends is not met merely reinforces the jury's own natural inclination to ignore what it considers irrelevant. For example, the Advisory Committee's Notes refer to the admissibility of a letter which would only be relevant to an issue at trial if the party had written or authorized it. If the jury concludes that the party did neither, the letter is of no concern to them.

The admissibility of a coconspirator's declarations, however, does not present a question of relevancy conditioned on fact which can be properly treated under Rule 104(b). Rather the admissibility of such statements must be evaluated by the trained legal mind. Moreover, coconspirator statements

---

6. The Court said that the preliminary determination of the voluntariness of the confession could be made by the trial judge, another judge, or another jury. Rule 104(c) now requires hearings on the admissibility of confessions to be conducted out of the hearing of the jury.

pose problems precisely because they are relevant. Indeed, such evidence endangers the integrity of the trial because the relevancy and apparent probative value of the statements may be so highly prejudicial as to color other evidence even in the mind of a conscientious juror, though he be instructed to disregard the statements or to consider them conditionally.

Courts have long recognized the logical dilemmas inherent in setting a standard for admissibility of coconspirators' declarations. *See, e. g., Carbo v. United States*, 314 F.2d 718 (9th Cir. 1963). Judicial development of this area of the law variously has sought to resolve conflicting needs to avoid unjustifiably prejudicing the defendant's case with untrustworthy evidence, to prevent purposeless exclusion of evidence relevant to the government's case, and to refrain from freighting the jury with instructions difficult to follow. Every effort to accommodate these goals has recognized that a court must set threshold requirements for proof of the existence of the conspiracy and the connection of the defendant and the declarant with the conspiracy before the jury may consider the declarations in arriving at a verdict. Although this threshold determination is always close to and often coincident with the ultimate question, it is an assay that must be made to prevent the admission of untrustworthy, prejudicial evidence.

Rule 104 has now made it clear that we must revise the procedures adopted in *Apollo* for testing the trustworthiness of coconspirator statements—that is for determining whether the conspiracy existed and whether the defendant and the declarant were members of it. Because the Rule 104(b) exception is inappropriate to test the admissibility of such declarations, we hold that Rule 104(a) requires that the judge alone make the threshold determination of the admissibility of the evidence.[7]

The jury is to play no role in determining the admissibility of the statements. This accords with the decisions of the Court of Appeals for the First Circuit in *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977), and *United States v. Martorano*, 557 F.2d 1 (1st Cir. 1977), which expressly held that Rule 104(a) controls the question of admissibility, and with decisions of other circuits which held even before the adoption of the Federal Rules of Evidence that the judge alone must determine the admissibility of coconspirator statements. *See, e. g., United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1964); *Carbo v. United States*, 314 F.2d 718 (9th Cir. 1963). Our holding is also supported by dictum in *United States v. Nixon*, 418 U.S. 683, 701 n.14, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974), where the Supreme Court stated: "Whether the standard has been satisfied is a question of admissibility of evidence to be decided by the trial judge."

Because the trial court is vested with the sole responsibility for determining the questions of fact for admissibility of coconspirator statements, the standard by which it makes this determination is to be high enough to afford adequate protection to the defendant against whom the evidence is offered, yet not so high as to exclude trustworthy relevant evidence. Therefore, we hold that coconspirator statements are admissible if the trial judge is convinced by a preponderance of the evidence that the conspiracy existed, that the defendant and the declarant were members of it, and that the statements were made in the course of and in furtherance of the conspiracy.[8]

---

7. Dictum in *United States v. Ochoa*, 564 F.2d 1155 (5th. Cir. 1977), suggests that subsection (b) is the appropriate portion of the rule. However, the question of the effect of the Rules of Evidence upon our present practice had not been raised at trial and we did not fully explore the issue. We do not consider ourselves bound by the dictum, particularly since three recent cases specifically alluded to the effect of Rule 104(a) and left the question open. *United*

States v. Hansen, 569 F.2d 406, 410 n.1 (5th Cir. 1978); *United States v. Tenorio*, 565 F.2d 943, 945 (5th Cir. 1978). *See also United States v. Dominquez*, 573 F.2d 366, 367 (1978); *United States v. Brown*, 555 F.2d 407 (5th Cir. 1977).

8. This is the standard adopted by the courts of appeals for the first and second circuits, *United States v. Petrozziello, supra,* and *United States*

■ Rule 104(a) provides that the court "is not bound by the rules of evidence except those with respect to privileges." However, we do not construe this provision as permitting the court to rely upon the content of the very statement whose admissibility is at issue. Rather, we adhere to our current requirement that fulfillment of the conditions of admissibility must be established from evidence independent of the coconspirator statements themselves. Only by requiring independent evidence to form the basis for admissibility will there be sufficient corroboration of the reliability of the statements. So while the court may look at other inadmissible evidence as well as admissible and admitted proof in making its determination, the actual disputed statements themselves may form no part of the basis for that determination. This construction of Rule 104(a) comports with earlier Supreme Court pronouncements that admissibility must depend upon independent evidence in order to prevent the statement from lifting itself "by its own bootstraps to the level of competent evidence." *Glasser v. United States*, 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). *See also United States v. Nixon*, 418 U.S. 683, 701 n.14, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (substantial independent evidence required).

■ The displacement of *Apollo* by Rule 104(a) must necessarily affect the order of proof at trial in most cases; otherwise defendants would face a danger of prejudice like that risked under *Apollo*. Under *Apollo*, the jury could hear coconspirator declarations with an appropriate instruction before admissibility was fully resolved. On defendant's motion at the close of the government's case, the judge could strike the testimony if no reasonable jury could find the defendant guilty beyond a reasonable doubt based on the nonhearsay evidence alone. If the judge was of the opinion that the evidence should be struck, he would also have to grant a motion to acquit, because

under *Apollo* these motions presented coincident questions of fact. Under Rule 104(a), however, unless the trial judge rules preliminarily on the admissibility of coconspirators' declarations, the new rule would retain the weakness of *Apollo*. The jury would still hear declarations of undetermined trustworthiness. If at the close of the government's case the declarations should turn out to be inadmissible, the judge would have to instruct the jury to perform the intellectually difficult task of deciding the case while disregarding prejudicial evidence of striking relevance—a job no less demanding than reaching a preliminary finding under *Apollo*. Therefore, under Rule 104 the court must not admit coconspirators' declarations until it has determined that the government has made the required threshold showing.

Thus, Rule 104 will affect the discretion accorded the trial judge under Fed.R.Evid. 611 to control the order of proof at trial, because the judge cannot allow the jury to hear a coconspirator's declaration until he has determined admissibility by a preponderance of the evidence. If the prosecution should seek to introduce a coconspirator's declaration early in the trial, sufficient evidence to support the threshold finding may not have come in. Thus, the government must either develop its proof of conspiracy and the defendant's and the declarant's connection with it before tendering a coconspirator statement or make such proof at an extrajury hearing. Discretion may well dictate that the development of lengthy proof to make such a declaration admissible occur only once. Because the matter is essential to the proof of any conspiracy charge and must eventually be heard by the jury, the judge may require that an early tender of a coconspirator's declaration be deferred until the requisite threshold showing has been made, rather than requiring the government to make its proof initially at an extrajury hearing.

---

*v. Geaney, supra* Weinstein, *supra*, at 104–44, suggests the criminal standard of proof beyond a reasonable doubt. The Ninth Circuit has adopted a prima facie case standard, *Carbo v. United States, supra.*

Rule 104(c) contains one express limit: hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. The Rule does not indicate specifically what other determinations need be so made, but provides generally for other determinations to be out of the hearing of the jury "when the interests of justice require." The Advisory Committee stated that detailed treatment of when preliminary matters should be heard outside the hearing of the jury was not feasible. Their Notes to Subdivision (c) suggest that the court may save time by taking foundation proof in the presence of the jury where the evidence on preliminary questions, though not relevant to jury issues, may be heard by the jury with no adverse effect. This rationale cannot apply to coconspirators' declarations because they present serious dangers of confusion and prejudice. Therefore, we hold that, under Rule 104(c), justice requires that the determination of the admissibility of coconspirators' declarations and any hearings necessary for the judge to make that determination by a preponderance of the evidence be conducted outside the presence of the jury.

If the court is satisfied that the statements are admissible, then they are to be considered by the jury along with the other competent evidence in determining the defendant's guilt or innocence. "To accept the problem as one of admissibility of evidence is to recognize that the declarations, if admissible, shall be considered by the jury *in reaching* its determination upon the issue of innocence or guilt." *Carbo v. United States*, 314 F.2d 718, 736 (9th Cir. 1963). Thus, once the trial court has determined out of the hearing of the jury that the statements are admissible, the jury is not to be instructed to make its own determination of admissibility.

Nothing in the procedure which we announce here deprives a defendant of a trial by jury. The judge is ruling solely on admissibility of evidence.[9] The guilt or innocence of the defendant must, of course, remain a question for the jury to be decided beyond a reasonable doubt.

Applying this standard to the appellants here as a matter of law, we are convinced by a preponderance of the independent evidence that the conspiracy existed, that each of the defendants and appellants were members of it, and that the statements were made in the course of and in furtherance of the conspiracy.

AFFIRMED.

## On Rehearing

Before BROWN, Chief Judge, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, and VANCE.

By the Court:

A majority of the Judges in active service, on the Court's own motion, having determined to have this case reheard en banc,

IT IS ORDERED that this cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.

---

9. We would note that Rule 104 does deprive the defendant of one significant safeguard which *Apollo* procedures vouchsafed. If the defendant made a motion to strike the hearsay testimony at the conclusion of all the proof, *Apollo* would have required that the hearsay be tested by whether a jury could find that proof beyond a reasonable doubt exclusive of the declarations established the elements of admissibility. The practice under Rule 104 will differ. Because admissibility has been judicially decided, the most a judge would do would be to reexamine his prior determination for error in applying the standard. Moreover, any concurrent motion for a judgment of acquittal will weigh all the proof including the declarations which have been allowed.