**UNITED STATES of America,**

**v.**

**Aniello DELLACROCE, et al., Defendants.**

**No. 85 CR 178.**

United States District Court, E.D. New York.

Jan. 3, 1986.

See also, D.C., 613 F.Supp. 312.

Raymond J. Dearie, U.S. Atty. (Diane F. Giacalone, John Gleeson, Asst. U.S. Attys., of counsel), Brooklyn, N.Y., for plaintiff.

Slotnick & Cutler (Bruce Cutler, of counsel), New York City, for defendant John Gotti.

Anthony Lombardino, Kew Gardens, N.Y. (Herald Price Fahringer, New York City, of counsel), for defendants John Carneglia and Charles Carneglia.

Michael F. Coiro, Jr., Bellmore, N.Y., (Hoffman, Pollok & Gasthalter, New York City, of counsel), for defendant Eugene Gotti.

Richard A. Rehbock, New York City, for defendant Wilfred Johnson.

David DePetris, New York City, for defendant Anthony Rampino.

Susan Kellman, New York City, for defendant Leonard DiMaria.

Barry S. Turner, New York City, for defendant Nicholas Corozzo.

MEMORANDUM AND ORDER

NICKERSON, District Judge.

The ten defendants named in the indictment moved for various relief prior to trial. Subsequent to oral argument one defendant died and another pled. By memorandum and order dated November 25, 1985 (familiarity with which is assumed) this court denied that part of the motion based on the Double Jeopardy clause.

The "Introduction" to the two count indictment alleges that two "crews" of the "Gambino Crime Family" plus their supervisor, defendant Aniello Dellacroce, now deceased, were "associated in fact" and constituted an "enterprise" within the meaning of the Racketeer Influenced Corrupt Organization Act (RICO), 18 U.S.C. § 1961(4). The Introduction describes the two crews as the Fatico/Gotti crew and the DiMaria/Corozzo crew, and asserts that the enterprise conducted its criminal activities by force and threats of force.

Count One alleges that in violation of 18 U.S.C. § 1962(d) defendants conspired to violate 18 U.S.C. § 1962(c). The latter section makes it unlawful for any person associated with an "enterprise" to conduct or participate in the conduct of its affairs through a pattern of racketeering activity or collection of unlawful debt. Count Two alleges a violation of 18 U.S.C. § 1962(c) and sets forth fifteen predicate acts constituting the pattern of racketeering activity.

I

Defendants urge that the indictment does not plead a single "enterprise" within the meaning of 18 U.S.C. §§ 1961 and 1962. They say that according to the indictment the two crews were distinct from one another, committed different types of crimes at wholly different times, and operated independently without a common purpose, and that this is not enough to make out an "enterprise."

■ The pleading of an "enterprise" is sufficient. The indictment describes the "enterprise" as made up of persons "associated in fact," namely, the two crews and their supervisor, comprising a "segment" of the Gambino Crime Family and alleges that this Crime Family supervised and participated in illegal activities generating money and other economic advantage. The indictment does not specifically repeat that the "enterprise" had this purpose. But, even if the law requires the pleading to state the purpose of the enterprise, the allegations are adequate. They plainly contemplate that the enterprise, that is, the "segment" of the Gambino Crime Family had the same objective as the larger entity.

The statute does not require an "enterprise" made up of individuals "associated in fact" to have the identical associates throughout its existence. Provided those charged are associated in fact at the times alleged, they constitute an "enterprise," 18 U.S.C. § 1961(4), which does not cease to exist when some leave or others join.

II

■ Defendants contend that the indictment does not properly allege a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962. They say that the fifteen acts of racketeering are sporadic and unrelated criminal episodes over a lengthy period and thus do not show persons engaged in a course of conduct for a common purpose. No doubt the government must prove at trial that the racketeering acts were done in the conduct of the affairs of the enterprise. Count Two so alleges, and no more is required.

The statute does not provide that the acts be similar in kind. *United States v. Weisman,* 624 F.2d 1118, 1122 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980). The only time requirements as to racketeering acts are set forth in 18 U.S.C. § 1961(5).

III

Defendants ask the court to dismiss Count Two because they claim that the paragraphs charging racketeering acts 6, 7, 13, 14, and 15 each allege more than one crime. In the alternative the defendants urge the court to strike the "duplicitous" language.

The allegations charging act 7 set forth only one crime. Under 18 U.S.C. § 1955 the state law violation is an element of the federal crime.

The other paragraphs referred to charge two crimes; paragraphs 6, 14, and 15 allege both a conspiracy to commit a substantive crime and the substantive crime; para-

graph 13 alleges the possession of both contraband and stolen cigarettes.

There is no reason to dismiss the count or strike the allegations. The court will instruct the jury that it may not find guilt based on one of the acts charged in the alternative unless the jurors all agree on at least one alternative.

IV

Defendants contend that the allegations of racketeering acts 6 and 10, charging conspiracy to murder, are defective because they do not allege overt acts in furtherance of the conspiracies. Defendants point out that section 105.20 of the applicable New York Penal Law conditions convictions for conspiracy on the pleading and proof of an overt act.

The defendants' argument is inconsistent with the language in *United States v. Bagaric,* 706 F.2d 42, 62–63 (2d Cir.) *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). Even if proof of an overt act is required, the RICO statute does not incorporate state rules of pleading.

V

Defendants argue that Count One, the conspiracy count, is defective because it does not allege an overt act, and that 18 U.S.C. § 1962(d) is unconstitutional if it does not require proof of such an act.

That section does not require proof of an overt act. *United States v. Ivic,* 700 F.2d 51, 59 (2d Cir.1983).

The act of conspiring is an act. The case of *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), finding in violation of the Eighth Amendment a statute making criminal the addiction to drugs is hardly comparable. The prosecution of defendants in Count One is not for what they are but for what they allegedly did, namely, conspire to commit illegal acts.

Nor does Count One charge, in alleged violation of the First Amendment, simply an agreement to advocate or to assemble to advocate crimes. *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), is thus not pertinent. The charge is that defendants conspired to do something against the law, that is, to participate in the conduct of an enterprise through a pattern of racketeering activity.

VI

Defendants, citing *Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), contend that the two counts in the indictment merge and that the court should dismiss one.

The *Jeffers* case discussed whether 21 U.S.C. § 846, making a narcotics conspiracy illegal, was a lesser included offense in a prosecution for a continuing narcotics criminal enterprise under 21 U.S.C. § 848. The latter section provides in subsection (b) that a person is engaged in such an enterprise if, among other things, he commits a federal felony drug offense that is part of a series of such violations undertaken by him "in concert with" five or more others whom he supervises. The Supreme Court assumed for the sake of argument that the words "in concert" require an "agreement" and thus treated § 848 as requiring proof of every fact necessary to show a violation of § 846.

In contrast 18 U.S.C. § 1962 contemplates that a conspiracy to participate in the conduct of the affairs of the "enterprise" through a pattern of racketeering activity is not the same thing as being part of the enterprise. An enterprise may consist of a single individual. However, the defendants contend that because the indictment alleges that the individuals who are "associated in fact" and comprise the "enterprise" consist of the two crews and their supervisor (encompassing all the defendants), the "conspiracy" here is the same as the "association," and that one count merges into the other.

The statute presupposes that an "enterprise" composed of individuals "associated in fact" is not inevitably composed only of those who conduct and participate in the conduct of its affairs through a pattern of

racketeering activity or collection of unlawful debt. An "enterprise" consisting of persons "associated in fact" may engage in some legitimate affairs or even have a laudable goal. The statute does not define the element of association in such an enterprise to require that each member agree to conduct the affairs of the association through a pattern of racketeering activity or collection of unlawful debt.

An unincorporated association may have many members and a perfectly proper purpose, while a few of its members in pursuit of that purpose engage in a pattern of racketeering activity or conspire to do so. Only those who do so violate 18 U.S.C. § 1962(c) or (d). Perhaps the same evidence will justify a finding of the existence both of an enterprise and of an illegal conspiracy charged. But the elements of the "association" and the "conspiracy" are not identical. Under the reasoning of *Iannelli v. United States,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), the counts do not merge.

VII

Defendants assert that Count Two improperly alleges conspiracies as predicate acts. The case of *United States v. Ruggiero,* 726 F.2d 913, 918–19 (2d Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984), forecloses this argument.

VIII

Defendants ask the court to dismiss the charges contained in seven of the racketeering acts asserted in Count Two on the ground that they are "stale." They urge that to require defendants to answer charges as to acts committed between November 1967 and April 1974 would be to violate due process.

■ By 18 U.S.C. § 1961(5) a pattern of racketeering activity requires at least two acts of such activity, the last act of which occurred within ten years after the commission of the prior act. The acts alleged meet the statutory standard, and defendants have shown no prejudice to justify a due process challenge.

IX

Defendants argue that the court should strike what they term surplus and prejudicial allegations in the indictment. They point to references such as the "Gambino Crime Family," the characterizations of various persons as boss, underboss, made members, capos, and the like, and the description of "Big Paul" Castellano as boss of the Gambino Crime Family. Defendants also regard the term "the Old Man" as prejudicial.

The government claims that it will prove at trial all these appellations and that they are relevant to the charges. The court cannot say the allegations are irrelevant and will not strike them.

X

Defendants urge the court to dismiss the indictment saying that the above "prejudicial" allegations show that the grand jury heard evidence to support them.

If the statements are relevant, the government properly submitted the evidence on which they were based.

XI

■ Defendants ask for a severance on the ground that a joint trial will violate due process and Rule 14 of the Federal Rules of Criminal Procedure.

The number of defendants, here eight, the nature of the acts of racketeering (conspiracies to murder, robbery, loan-sharking and the like), and the possible length of the trial are all matters of concern and factors that this court has weighed in determining whether defendants can get a fair trial. The fact that other, evidently more complex, cases involving organized crime and more numerous defendants are going forward in this and other courts is, of course, not conclusive.

This court's experience in other prosecutions of a magnitude and complexity similar to this suggests that with careful in-

structions the jury will be able to function properly and to make appropriate distinctions between defendants. For example, in *United States v. Praetorius,* CR 78-00135(s) (E.D.N.Y.1978), an earlier stage of which is reported at 451 F.Supp. 371 (E.D. N.Y.1978) and later stages of which are reported at 462 F.Supp. 924 (E.D.N.Y. 1978), and 622 F.2d 1054 (2d Cir.1979), *cert. denied,* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980), the jury found several of thirteen defendants guilty of conspiracy to import and distribute heroin, acquitted some of conspiracy, and could not agree as to the substantive offenses charged against any. This has not been an isolated instance in the court's experience. The juries in this district appear to have been conscientious and to have applied the court's instructions carefully and intelligently. A jury in this case can do the same.

The court finds no substance in the argument of defendant DiMaria under Rule 8 of the Federal Rules of Criminal Procedure. The indictment pleads only one enterprise. Nor do his contentions under Rule 14 have merit.

XII

Since defendant Armond Dellacroce has pled guilty, the court need not consider the particular arguments he advanced for severance.

XIII

Defendants ask the court to conduct a hearing to determine whether statements the government intends to offer as co-conspirator declarations are admissible under Rule 801(d)(2)(E), citing *United States v. James,* 576 F.2d 1121 (5th Cir.1978), *modified en banc,* 590 F.2d 575 (5th Cir.), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

The government opposes this request except as it concerns alleged statements made by defendant Wilfred Johnson and one William Battista. The government says that they played double roles, acting both as informants and as co-conspirators. Their statements as informants would not be admissible; those made by them as co-conspirators would be. The court will therefore hold a hearing on the issue.

The court finds no sufficient reason to conduct hearings as to the statements of other alleged co-conspirators. The court will follow the procedure heretofore used in this circuit. *See, e.g., United States v. Margiotta,* 688 F.2d 108, 136-37 (2d Cir. 1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

XIV

The court in its memorandum and order dated November 25, 1985, denied defendants' claims that the Double Jeopardy clause requires dismissal of certain racketeering acts.

XV

Defendants make a variety of challenges to the admissibility of conversations intercepted and recorded pursuant to orders of state and federal courts. One such claim is as to conversations intercepted by telephone wiretap and "bug" at the residence of Angelo Ruggiero.

The same contentions with respect to the Ruggiero tap and bug are before Judge Costantino in the case of *United States v. Ruggiero, et. al,* CR 83-00412. The parties have submitted the matter on the papers in that case.

Judge Costantino has been holding hearings as to whether the agents failed to "minimize" the interception of communications. That matter is not in issue because only Angelo Ruggiero, not a defendant here but whose premises the agents tapped and bugged, has standing to raise it. *United States v. Fury,* 554 F.2d 522, 526 (2d Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977).

Defendants, by letter dated December 19, 1985, urge that while only Ruggiero may have standing to claim a failure to minimize, all those defendants whose conversations were intercepted have stand-

ing to complain about continuous "live monitoring." They say that such monitoring is analogous to the execution of a general warrant or "rummaging" in the execution of a general warrant and is a violation of the Fourth Amendment, whereas the failure to minimize is merely a statutory violation.

The court does not accept the distinction. The citation in the *Fury* case, *supra,* of *Alderman v. United States,* 394 U.S. 165, 171–76, 89 S.Ct. 961, 965–68, 22 L.Ed.2d 176 (1969), shows that the Court of Appeals was applying a general principle that only the person whose premises were tapped or bugged could complain. To put it in modern parlance, only he had a legitimate expectation of privacy.

This court holds that none of the defendants in the present case has standing to raise objections to the manner of execution of the warrants.

Nor has any defendant in this case standing to raise the issue now before Judge Costantino of whether the agents improperly intercepted confidential communications between Ruggiero and his alleged lawyer. The attorney client privilege is solely that of the client.

It could be argued that defendant Eugene Gotti, to the extent he was a party to the conversations between Ruggiero and the lawyer, may object to them. The argument is that (1) Eugene Gotti and Ruggiero were then both clients of the lawyer, and the communications were for the purpose of enabling the lawyer to give legal advice to them jointly, and (2) even if the conversation was not privileged as to Eugene Gotti, he is an "aggrieved person" within the meaning of 18 U.S.C. § 2510(11) because he was a "party" to the intercepted communications and thus under 18 U.S.C. § 2518(10)(a)(i) was entitled to move to suppress them as "unlawfully intercepted" because privileged.

The court has examined the affidavits of Eugene Gotti and the lawyer as well as the transcripts of the conversations where Eugene Gotti, Ruggiero, and the lawyer were all present. The court is satisfied that none of those conversations had to do with the obtaining or giving of legal service or advice to Eugene Gotti. He therefore had no attorney client privilege with respect to them. *Colton v. United States,* 306 F.2d 633, 637 (2d Cir.1962), *cert. denied,* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); *United States v. Kovel,* 296 F.2d 918, 921–22 (2d Cir.1961).

Since Eugene Gotti had no attorney client privilege, neither did Ruggiero as to communications in the presence of Eugene Gotti. There is no privilege when a third party participates. *United States v. Jamil,* 546 F.Supp. 646, 651 (E.D.N.Y.1982), *rev'd on other grounds,* 707 F.2d 638 (2d Cir.1983); *United States v. Pipkins,* 528 F.2d 559, 563 (5th Cir.), *cert. denied,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976). Thus such communications were not "unlawfully intercepted" as to Ruggiero within the meaning of 18 U.S.C. § 2518(10)(a)(i).

But even if the conversations were "unlawfully intercepted" as to Ruggiero because of the attorney client privilege, they were not "unlawfully intercepted" as to Eugene Gotti. As noted, the privilege belongs to the client. Eugene Gotti thus is not an "aggrieved person" under 18 U.S.C. § 2510(11). That term is to be construed in accordance with the usual standing rules. *Alderman v. United States, supra,* 394 U.S. at 176 n. 9, 89 S.Ct. at 968 n. 9.

This court does not pass on the propriety of interception of any conversation during which Eugene Gotti was absent.

Defendants' other contentions are that (a) the government failed to obtain the "immediate" sealing of the Ruggiero wiretap evidence pursuant to 28 U.S.C. § 2518(8)(a), (b) the applications for the Ruggiero orders did not meet the "alternative investigative procedures" of 18 U.S.C. § 2518, and (c) there was insufficient probable cause to sustain the interceptions. In a case involving the identical orders, *United States v. Massino,* 605 F.Supp. 1565 (S.D.N.Y.1985), Judge Sweet decided all these matters.

The court agrees with Judge Sweet's rulings for the reasons stated in his opinion. This court denies defendants' motion to suppress except as to the sixth and final order and suppresses it fruits.

The court is informed that an appeal is pending in the *Massino* case. In the event the Court of Appeals reverses Judge Sweet's order this court will entertain an application for reconsideration.

XVI

Defendants attack the validity of a court ordered wiretap of two pay telephones in a vacant storefront next to the Bergin Hunt and Fish Club (the Bergin Club) in Queens.

The initial wiretap order by the New York State Supreme Court was based on an affidavit of New York City Detective John J. Holder, Jr. He sought authority to intercept the conversations of Frank Guidici and William Battista and bookmakers and bankers of gambling operations over the two telephones. Defendants contend that the affidavit did not establish probable cause to believe that the telephones were being used to conduct an illegal gambling business, but showed only that Guidici and Battista were placing bets, an offense for which wiretapping is not authorized.

Holder's affidavit makes, in substance, the following statements. Assigned for nine years to the Organized Crime Control Bureau, he had investigated numerous gambling and usury violations and had often qualified as an expert witness on gambling. Since late September 1980 he and fellow officers had maintained a sustained surveillance of the vacant storefront and the Bergin Club which had no telephones.

No one used the two telephones in the storefront other than the frequenters of the Bergin Club. Battista and Guidici, among others, often used them to make outgoing and receive incoming calls. Pen registers revealed that calls from the phones were made to numbers registered to an R. Bell in Ridgewood, Queens. On March 5, 1981, Holder pursuant to a warrant searched that Queens location and seized records showing a daily gross of some $5,000 in gambling receipts. The records included a sheet tacked to the wall listing among other numbers those for the two telephones in the storefront. Holder arrested a Peter Schiavone at the same time, and he later pled guilty to promotion of gambling and possession of gambling records.

Less than two weeks after that search and seizure, two telephones were installed at another address in Ridgewood, Queens and registered to an Albert Bell. Between March 25, 1981 and April 3, 1981 Battista, Guidici, and a Richard Gotti made calls to these telephones from the storefront. Schiavone was seen on two occasions, on April 14, 1981 and April 15, 1981, going to this second Ridgewood address and then leaving it and proceeding to a Brooklyn address with a brown paper bag which he left there.

Holder's expert opinion was that Schiavone, as clerk, was operating the second Ridgewood address as a wireroom for illegal gambling operations, and was receiving calls from bettors and bookmakers, including calls from bookmakers to lay off bets. Based on his experience Holder was of the opinion that the list of telephone numbers seized at the first Ridgewood address was the type of list that a wireroom clerk has of the numbers of his bosses and other bookmakers to enable him to lay off bets. Holder gave his opinion that the Brooklyn address was Schiavone's "figure room" or "bank" where he tallied the numbers and processed the work.

On April 3, 1981 Battista and Guidici had a heated conversation in front of the Bergin Club. Guidici was angry because a "ticket" for $1000 was "put in" for $500 and insisted that "he owes five hundred yet." Battista advised Guidici not to get excited and to call "him." Guidici then called the wireroom from the vacant storefront. In Holder's opinion the "ticket" referred to a $1000 bet placed with a bookmaker and put through by the bookmaker for $500. Holder said that the conversation between Guidici and Battista could not

possibly be about a bet Guidici had placed. It had been "put in" for only $500 rather than $1000, and when Guidici talked about the bookie owing $500, this obviously was not a reference to payment on a winning bet. Holder concluded that Guidici was the boss of Schiavone's wireroom and that the calls made by Guidici were to his confederates in the gambling operation.

Defendants concede that Schiavone was operating an illegal gambling wireroom and that the two telephones used at the storefront were used to call the wireroom. Defendants contend, however, that those phones were used only by ordinary bettors to place bets but not by bosses in furtherance of an illegal gambling operation. They argue that the frequency of certain calls made by Battista within the same minute to the two numbers of the wireroom phones is more consistent with betting than bossing. They say an anxious bettor would do just such a thing to place his bet.

However, the conclusions drawn by Holder from the conversation between Guidici and Battista seem reasonable even to a layman. The words exchanged do not sound as if they concerned a bet Guidici phoned in for himself. The inference is more plausible that they referred to someone else's bet for which the gambling operation was responsible. It is more likely that the statement "he owes $500 yet" refers to a debt owed to the organization which employed the bookie than to a debt owed to an ordinary bettor.

The court concludes that the affidavit sufficiently set forth probable cause.

Defendants argue that the application did not show a necessity for the wiretap. In the affidavit Holder set forth his reasons for believing that other investigative procedures had failed, were unlikely to succeed, or were too dangerous to employ (Affidavit ¶¶ 20–23). It is true that no pen registers or wiretaps were installed on Schiavone's wirerooms. But this could hardly have been expected to yield the information sought (Affidavit ¶ 23). The court cannot say that Holder's reasons for not using informants more extensively were without substance. The investigation made before the application for the wiretap was reasonably lengthy and extensive, and there was no precipitous resort to electronic surveillance that should have been denied.

Defendants argue that the order twice amended and twice extended should not have been extended beyond July 2, 1981. They contend that by then the objectives of the investigation had been or should have been attained. Even if the electronic surveillance before the order of that date established probable cause, the law does not require the investigation to end at that point. *United States v. Carubia,* 377 F.Supp. 1099 (E.D.N.Y.1974). The government was entitled to develop the full scope of the operation and the identities of the participants.

## XVII

Defendants ask the court to hold a hearing to determine whether statements in the affidavit in support of the warrant for the electronic surveillance of the Ravenite Social Club (the Ravenite) were intentionally false or recklessly untrue.

Under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), defendants may have such a hearing if they make "a substantial preliminary showing" of perjury or reckless disregard of the truth in the affidavit, provided its remaining content is insufficient to establish probable cause.

In January 1980 defendant Armond Dellacroce appeared pursuant to a subpoena before a New York County grand jury and refused to answer questions based on information obtained through the same allegedly illegal electronic surveillance of the Ravenite as is at issue here. The affidavit in support of the application for a warrant referred to statements by police officers describing conversations they allegedly overheard outside the Ravenite.

Armond Dellacroce's attorney retained Dr. Louis Gerstman, a professor of psychology and speech at City College, who, after conducting experiments, concluded that the officers could not have heard the conversations. A Justice of the New York Supreme Court then denied the attorney's motion to hold a hearing as to the credibility of the probable cause affidavit, finding that the affidavit of Dr. Gerstman had "not made the showing required" by the *Franks* case.

Defendants resubmit the affidavit of Gerstman dated April 8, 1980, and reassert the contentions made in that year. The six conversations in issue allegedly took place between March 23, 1979 and June 12, 1979. Each was said to have been heard by a detective or an officer from an observation point across the street from the Ravenite.

The Gerstman affidavit does not meet the criteria established by the *Franks* case. He conducted his observations some distance away from the position from which the officers say they overheard the conversations. He assumed that they took place in "free fields," that is, outdoors without "reflections," although they occurred close to buildings, which presumably would reflect the sound across the street. He also assumed that five of the six conversations were in voices at a "normal" level, a condition hardly likely given the nature of what was said.

In any event, this court holds that, even if those conversations were deleted from the affidavit, the remaining content is sufficient to support a finding of probable cause. The affidavit details observations of occurrences outside the Ravenite and recites various conversations (other than those at issue) establishing probable cause to believe that some repetitive criminal activity was going on there. Moreover, several specific conversations made likely the conclusion that the kind of illegal activity the denizens of the club were conducting was loansharking. Affidavit ¶¶ 14–15, 18–19, 38–39, 48–49. For example, it is hardly unreasonable to infer that when a man before entering the club tells someone else that a debtor should get some "bread up" in the amount of $5000 or "he could slip on the ice and break both his (expletive deleted) legs," the reference was to loansharking. Affidavit ¶¶ 18–19.

Defendants say that the extension of the warrant pursuant to the application of July 17, 1979 was improper because the taped conversations referred to in the warrant affidavit are inaudible. Defendants also ask for an audibility hearing to determine whether the tapes are admissible. The court will hold such a hearing.

## XVIII

Defendants ask the court to suppress evidence derived from a wiretap obtained by the Suffolk County District Attorney for the telephone of defendant DiMaria. They contend that (1) the Suffolk District Attorney had no authority to apply for a Brooklyn wiretap order that yielded information contained in the later DiMaria wiretap application, (2) the warrant affidavit did not show facts establishing probable cause for the Brooklyn order, and (3) the affidavits for that order and the DiMaria order failed to show that normal investigative techniques had been tried and found wanting.

The first argument has no substance. There was as much "nexus" between the Suffolk County investigation and Kings County as there was between the two counties in *People v. DiPasquale,* 47 N.Y.2d 764, 417 N.Y.S.2d 678, 391 N.E.2d 710 (1979).

The facts stated in the affidavit in support of the Brooklyn order were sufficient to show probable cause. The conversation recorded on the Suffolk County tape of the person who answered the Brooklyn telephone plainly showed he was engaged in the illegal gambling conspiracy being investigated in Suffolk County.

A chief target of the Suffolk County investigation was acutely aware the authorities were following him. Persistent surveillance through wiretaps and other means had not revealed the scope of the

operation and the identity of the participants. The District Attorney was not required to use further means of investigation before applying for the Brooklyn order.

The claim that normal investigative procedures were not used before applying for the DiMaria order is inconsistent with the statements in the affidavit that surveillance of two of the chief conspirators and of the meetings of the members of the conspiracy had not disclosed what went on at the meetings or the role of each conspirator. It was reasonable to believe conventional procedures would be unsuccessful in obtaining this information.

The application to suppress the information derived from the DiMaria wiretap is denied.

XIX

The government has represented that it does not intend to offer any statements of defendants other than those taken post arrest relating to pedigree and those made at guilty pleas. There are thus no statements for the court to rule on.

XX

Although defendants have made a generalized request for a hearing on all evidence illegally seized, they cite no specifics. Their request is therefore denied.

XXI

Defendants move to suppress any identification based on a lineup, show up, photo display, or voice exemplar. The government represents there were none.

XXII

Defendants ask that the government furnish further particulars of the charges pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure.

On November 22, 1985 the court focussed at oral argument on the items requested and has studied the parties' briefs. The government has made available considerable information and in court made certain factual representations, stating it was prepared to supply further information as to certain items, namely, numbers 4, 8, 9, 10, 11, 12, 13, 14 and 15. The court does not preclude defendants from making further application should the government not supply that information. But the court will not require disclosure of the identity of coconspirators, the dates on which each conspirator joined, the identity of each place where a crime occurred, the means each defendant used to conspire, the identity of witnesses, or the other particulars demanded.

The government does not seem to have stinted in making available extensive documents and details. The tone of the requests of defendants' attorneys is to require the government to disclose, as they put it in request number 28, "all acts of each defendant, verbal or non-verbal, which would entitle the trier of fact to infer that the defendants" conspired. The court will not order the government to furnish such details.

XXIII

Defendants, while agreeing that the government has been cooperative in providing certain material, ask for further discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure, the Fourth, Fifth, Sixth and Ninth Amendments, "and any other applicable federal statutes, regulations and court rules, as well as the cases thereunder." They do not specify these "applicable" statutes, rules and cases, relying no doubt on the court to know or to find them.

As to these demands the government's brief has made representations that the court accepts in the absence of specific refutation. The court will not require revelation now of material required to be produced under 18 U.S.C. § 3500. Nor will the court order disclosure of the identity of witnesses or informants other than Johnson and Battista.

XXIV

The government asserts that it has complied and will continue to comply with its

obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and says that it is not aware of any exculpatory information. The government is aware of decisions such as *Grant v. Alldredge,* 498 F.2d 376 (2d Cir.1974), and therefore presumably knows of no specific evidence of a material nature requiring pretrial disclosure to allow for full exploitation by the defense. Impeachment evidence generally need not be disclosed before trial.

XXV–XXXI

Defendants assert that various improprieties may have taken place before the grand jury, namely, that (1) unauthorized persons may have appeared, (2) the government may not have presented exculpatory evidence or may have presented insufficient evidence, (3) some grand jurors may not have heard all the evidence, (4) the grand jurors may have received misinstruction on the law, and (5) the government may have made improper use of summary witnesses and of hearsay. Defendants ask that the court either undertake to examine the grand jury proceedings or order discovery concerning them.

Some of defendants' assertions do not state improprieties. But in any event the arguments are inconsistent with the requirement that grand jury proceedings remain secret except upon a showing of compelling and particularized need. *In re Grand Jury Investigation of Cuisinarts, Inc.,* 665 F.2d 24, 28 (2d Cir.1981), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983); *In re Rosahn,* 671 F.2d 690, 695 (2d Cir.1982). Defendants have not advanced any facts that would justify the court in disturbing the secrecy of the grand jury proceedings.

* * *

The court denies defendants' motions except to the extent stated. The court will hold hearings to determine the extent to which the statements of Wilfred Johnson and William Battista are admissible and the audibility of the conversations recorded on the Ravenite tapes made pursuant to the extension order sought July 17, 1979. The court suppresses the fruits of the sixth and final Ruggiero order.

So ordered.