**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank  RODRIGUEZ,
Defendant-Appellant.**

No.  74–3031.

United  States  Court  of  Appeals,
Fifth  Circuit.

March  20,  1975.

William A. Daniel, Jr., Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Charles Jaffe, Asst. U. S. Atty., Miami, Fla., Karen L. Atkinson, Crim. Div., U. S. Dept. of Justice, Miami, Fla., for plaintiff-appellee.

Before DYER, MORGAN and GEE, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

In this case appellant, convicted of conspiracy to import cocaine, charges that certain errors were committed during the course of his trial. Finding his allegations meritless, we affirm his conviction.

I.

Viewed in the light most favorable to the government, *see* Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1941), the facts are these. In January, 1971, Al Nardone, a confidential informant, met Jaime Castello-Yepez (hereinafter "Yepez") on an airplane flight from New York to Miami. In response to Nardone's inquiry, Yepez indicated that a "kilo" of cocaine could be purchased in the United States for about $8,000, gave Nardone his card, and told Nardone to contact him at the Hotel Bradford in Miami.

In July of 1971, Nardone called the Hotel Bradford and a meeting was ar-

ranged between Aurelio Castro and Juan Arteaga, who claimed to be Yepez's associates, and Nardone and Peter Scrocca of the Drug Enforcement Administration, working under cover. At the meeting on July 13, 1971, Scrocca told Castro and Arteaga that he wanted to buy 100 kilos of cocaine. Castro said that there would be no problem, but he would have to contact Yepez. During the conversation Castro gave Scrocca Frank Rodriguez's name and phone number. He also said that Rodriguez was Yepez's man in Miami and Scrocca should contact him if there were any problems.

After making arrangements by phone, Nardone, Scrocca, and Agent William D. Hudson met with Rodriguez on July 16, 1971. At this meeting Scrocca told Rodriguez that he (Scrocca) had made arrangements with Castro and Arteaga for the shipment of a quantity of cocaine but that they had departed prematurely, and he had no knowledge if the final arrangments had been made. Rodriguez replied that he did not know Castro or Arteaga, but that he represented Yepez in Miami and would contact Yepez in Ecuador to resolve Scrocca's problem.

On July 20, 1971, Hudson and Nardone again met with Rodriguez who said that he was going to Ecuador and would have Yepez call Nardone to straighten the matter out. Within a day or two Yepez called Nardone to devise a method of payment for the cocaine. A period of negotiation followed. During one of the subsequent conversations, Yepez indicated that Nardone should pay Rodriguez for the drugs.

In late August Nardone met Yepez in Ecuador at the latter's invitation. Yepez showed Nardone his cocaine laboratory. In March 1972, Nardone again returned to Ecuador to negotiate with Yepez who again indicated that payment should be made to Rodriguez.

On July 13, 1973, Scrocca and other agents met Yepez in Kingston, Jamaica. During this meeting, Scrocca made plans to purchase 100 kilos of cocaine a month from Yepez. Yepez indicated that Rodriguez was in narcotics traffic with him

but would not take an "active, out-front part" in this deal because of Internal Revenue problems. Yepez also told the agents that a shipment of cocaine was to arrive in New York around June 29 by boat and that Scrocca could have part of the shipment. Yepez stated that the boat would make intermediate stops in Jacksonville and Baltimore.

At the end of June, 1973, Rodriguez contracted with Harold Wright to pick up cartons that were to arrive at the port of Baltimore on July 3, 1973, and transport them to New York. Rodriguez told Wright which broker to contact in Baltimore, gave him a bill of lading for the boxes, and $100 to cover the shipping charges. Rodriguez instructed Wright to pick out 30 of the boxes in the shipment of 450, explaining that these could be identified by the configuration of the staples holding the boxes together.

On July 3, 1973, cocaine was discovered during a customs search in the boxes Wright was to pick up. As a result, when he arrived at the pier and claimed the boxes, Wright was arrested.

On August 26, 1973, Scrocca met with Frank Rodriguez and asked him what had happened to the cocaine that Yepez had shipped. Rodriguez said that he would find out and suggested a meeting the next day. This meeting occurred on August 28, 1973, at which time Rodriguez told Scrocca that Yepez had been arrested in Ecuador but would probably be released in the near future.

On February 25, 1974, Nardone, Scrocca, and Agent James Milford visited Rodriguez at his home. Scrocca told Rodriguez that he knew Rodriguez was Yepez's partner and that he was shipping cocaine to New York. Rodriguez replied that all this was true. Rodriguez said that he "was aware of everything that Castello-Yepez told anyone, both in South America and in the United States, and he was well aware of the pending deal." He also said that Yepez would probably be out of jail very soon and suggested that, when Yepez was released, they hold a meeting in Mexico or

Panama to resolve all problems relative to both their current business and any future business they might conduct.

On March 14, 1974, Rodriguez, Yepez, Wright, Castro, Arteaga, and Piedad Romero de Herrera were charged in a one-count indictment with conspiracy to import cocaine in violation of 21 U.S.C. §§ 952 and 963. Yepez, Castro, Arteaga, and de Herrera were never apprehended.

At the subsequent trial, Wright pleaded guilty and testified as to all of the instructions Rodriguez had given him. Nardone, Scrocca, Hudson, and Milford also testified as to their conversations with the named defendants, recounting both their comments and those of the alleged co-conspirators. The jury returned a verdict of guilty and appellant was sentenced to ten years imprisonment and a special parole term of three years.

Rodriguez appeals, alleging that certain errors were committed in his trial.

## II.

█ Appellant first contends that extrajudicial statements made by co-defendants Castro, Arteaga, and Yepez, outside the presence of the appellant were improperly admitted into evidence. We hold that these statements, although hearsay, were properly admitted as declarations of co-conspirators made during the course of the conspiracy and in furtherance of it.

█ Of course, the government must introduce sufficient independant evidence of the existence of a conspiracy and of appellant's participation therein before the judge may allow declarations of the co-conspirator, made outside of the presence of the defendant, to go to the jury. United States v. Apollo, 476

F.2d 156, 157 (5th Cir. 1973); Montford v. United States, 200 F.2d 759, 760 (5th Cir. 1952). The test of sufficiency is whether the other evidence, *aliunde* the hearsay, would be sufficient to support a finding that the defendant himself is a conspirator—that is, whether the government has established a prima facie case of the existence of a conspiracy and of defendant's participation therein. United States v. Oliva, 497 F.2d 130, 132-33 (5th Cir. 1974).

The trial judge below properly required that the government show the appellant's participation in the conspiracy by evidence other than hearsay before allowing the jury to hear any of the extrajudicial statements of the co-conspirators. The government met this burden by having Agent Scrocca describe the July 16, 1971 meeting with Rodriguez. The judge then held that the government had made a sufficient showing that Rodriguez was a member of the conspiracy. We believe the judge's ruling that sufficient evidence of a conspiracy and of defendant's participation therein had been presented was correct.[1]

█ Appellant next contends that the trial court erred in admitting into evidence extrajudicial declarations of co-conspirators which were not made in furtherance of the conspiracy charged in the indictment. Of course, declarations by co-conspirators are admissible under the conspiracy exception to the hearsay rule only if they are made in furtherance of the conspiracy and during its pendency. Paoli v. United States, 352 U.S. 232, 237, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957); Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1952); Holsen v. United States, 392 F.2d 292, 298 (5th

---

1. There were, moreover, voluminous amounts of evidence subsequently admitted which established a prima facie case as to the existence of a conspiracy and Rodriguez's participation. First, the testimony of Scrocca, Hudson, and Nardone established the existence of a conspiracy independent of any hearsay utterances. Second, Rodriguez's own words and acts indicated his participation. For example, in addition to the July 16 meeting,

Rodriguez spoke with Nardone and Agent Hudson on July 20, 1971, and indicated that he was going to Ecuador and would have Yepez contact Nardone. Wright, a co-defendant, testified that Rodriguez contracted him to pick up the cartons containing the cocaine. And, on February 25, 1974, Rodriguez indicated his knowledge of the "pending deal" and his intention to arrange a subsequent meeting.

Cir. 1968), cert. denied, 393 U.S. 1029, 89 S.Ct. 640, 21 L.Ed.2d 573 (1969).

■ Appellant claims that the references to Rodriguez made by Castro and Arteaga—although in furtherance of a conspiracy—were not made in furtherance of the conspiracy with which Yepez, Wright, and Rodriguez were charged because the two declarants left town before consummating the deal. The record indicates, however, that the meeting between the agents and Castro was but the first step in one continuous conspiracy to import cocaine. Rodriguez entered this conspiracy rather than undertaking a new one when he followed up the initial negotiations by putting the agents in touch with Yepez.

■ Appellant also argues that it was improper to permit Agent Miller to testify as to statements made by Wright after Wright's arrest, since the conspiracy had been terminated by the seizure of cocaine in Baltimore, and Wright's statements were therefore not made during the pendency of the conspiracy.

■ The indictment against Rodriguez, however, did not indicate that the conspiracy terminated with the seizure of cocaine; rather, it charged a conspiracy continuing until March 14, 1974. Plainly, Rodriguez's actions in no way indicated a conclusion on his part that the conspiracy had terminated with the seizure in Baltimore. Rather, in the meeting of February 25, 1974, he indicated that he would arrange a future meeting between the agents and Yepez to discuss future transactions. The fact that one shipment had gone awry in no way terminated Rodriguez's goal of dealing with the agents.[2]

■ The appellant next argues that the trial court erred in admitting extrajudicial declarations of government agents who testified as to their own con-

---

2. In oral argument, appellant also contended that it was error to permit Agent William Miller to testify as to statements Wright made after his arrest because these were not made in furtherance of the alleged conspiracy.

Miller was called as a witness by the appellant. Appellent's counsel questioned Miller about a conversation with Wright on July 10, 1973, during which Wright told the agents that he was picking up the cartons for one Sergio Mareno and that he was not employed by Frank Rodriguez.

On cross examination, the government attempted to show that in Wright's subsequent conversations with Miller, Wright had admitted that he lied about his true employer in the conversation of July 10, 1973, and that Rodriguez employed him at the time of the seizure.

During the cross examination, the following exchange occurred:

Q. Agent Miller, did you have occasion to have subsequent discussions with Mr. Wright about this Sergio Mareno?

A. Yes; I have.

Q. And when was that?

A. The other day, out here in the Marshal's office.

Q. And what did he tell you then?

A. He had told us that what he had said before—Of course, we knew what he said before was basically—

MR. DANIEL: Objection, Your Honor as to—

THE COURT: Sustained. What did he tell you at this time?

Appellant now argues that his objection to Miller's testimony was sustained, and, consequently, that Miller should not have been permitted to testify as to Wright's subsequent conversations because they were not in furtherance of the conspiracy.

Appellant's counsel assures us that he did not renew his objection as Miller continued to testify about Wright's statements because he misunderstood the trial judge and thought his objection had been denied. However, a reading of the transcript convinces us that appellant objected—and the trial judge properly sustained the objection—only as to any testimony pertaining to what Miller knew rather than what Wright had told him.

Moreover, had appellant's counsel objected to the admission of Wright's subsequent statement to Miller, we believe the district judge's response would have still been in order. The government's cross examination of Miller was clearly within the scope of the appellant's direct examination, inasmuch as appellant first elicited testimony regarding Wright's prior conversations with Miller. Furthermore, inasmuch as the appellant attempted to impeach Wright's testimony by introducing evidence of prior inconsistent statements, it was proper for the government to introduce evidence of subsequent consistent statements. See, United States v. Jimenez, 496 F.2d 288, 292 (5th Cir. 1974); United States v. Gandy, 469 F.2d 1134 (5th Cir. 1972); United States v. Bays, 448 F.2d 977 (5th Cir. 1971), cert. denied, 405 U.S. 957, 92 S.Ct. 1186, 31 L.Ed.2d 234 (1972).

versations with indicted co-conspirators. Appellant claims that the testimony of a government agent as to his own statements made outside the presence of the defendant are hearsay[3] and therefore inadmissible.

Appellant relies upon United States v. Williamson, 450 F.2d 585 (5th Cir. 1971), but his reliance is misplaced. In *Williamson* one agent testified to the extrajudicial remarks made to him by another agent, and this testimony was introduced in order to prove the facts asserted in the extrajudicial statements. Here, however, each agent testified as to his own prior out-of-court statements. Since the extrajudicial statements were introduced in the testimony of the extrajudicial declarant, and since each declarant could be cross-examined as to the statement he had made, the testimony was not hearsay. See 5 Wigmore, Evidence (3d ed.) § 1364. Moreover, it is doubtful that any of this testimony was used to prove the accuracy of facts asserted extrajudicially. Rather, the statements were used only to place the replies of the appellant in context.

On several occasions, one agent was also permitted to corroborate the fact that a statement, already admitted into evidence in the testimony of the declarant, was made by another agent. Appellant's counsel never objected to this corroborative testimony since it was apparent to him as it is to us, that the testimony was not used to prove facts asserted in the out-of-court statements.[4] Of course, government agents were also permitted to testify to the out-of-court responses made by the co-defendants. While this testimony was used to prove the facts asserted in the extrajudicial responses, it was clearly admissible under the co-conspirator exception to the hearsay rule which we have discussed above.

Appellant's final contention is that there is insufficient evidence to support the jury's verdict. The verdict of the jury must be sustained on appeal if there is substantial evidence to support it. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1941); United States v. Carlton, 475 F.2d 104, 105–106 (5th Cir. 1973); Odom v. United States, 377 F.2d 853, 855 (5th Cir. 1967).

Appellant first claims that the evidence shows several rather than one continuing conspiracy with various parties joining at different times. Whether a scheme is one conspiracy or several conspiracies is primarily a jury question. Koolish v. United States, 340 F.2d 513, 526 (8th Cir. 1965), cert. denied, 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965); United States v. Dardi, 330 F.2d 316, 327 (2nd Cir. 1964), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964). It is not necessary that Rodriguez know each of the other co-conspirators, Blumenthal v. United States, 332 U.S. 539, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947), or be aware of each part of the unlawful plan, United States v. Dardi, 330 F.2d 316, 327 (2nd Cir. 1964). It is only necessary that appellant know of the conspiracy and associate himself with it. *Id.* Here, the appellant had knowledge of the conspiracy and its essential objective—to buy cocaine—and he agreed to further the conspiracy by contacting Yepez in Ecuador. Without restating all of the evidence, we believe that the testimony, taken as a whole, justified the jury's conclusion that there was one continuous conspiracy beginning with Nardone's contact with Yepez and continuing through the February 24, 1974, meeting between the government agents and Rodriguez.

---

**3.** A hearsay statement is an extrajudicial declaration offered to prove the truth of the matter stated. *See,* McCormick, Evidence, § 246 (1972).

**4.** Even if the testimony was used to prove the facts asserted in out-of-court statements, any error in the admission of this evidence was not prejudicial since the declarant in all cases was present, gave testimony which was, in all respects, identical to that of the witness, and was subject to vigorous cross examination. United States v. Wilkerson, 469 F.2d 963, 968 (5th Cir. 1972); United States v. Williamson, 450 F.2d 585 (5th Cir. 1971).

Appellant also claims that the evidence is insufficient because it fails to show an overt act done in pursuance of the conspiracy. *See* United States v. Carlton, 475 F.2d 104, 105 (5th Cir. 1973). Again, we believe that the evidence disclosed numerous overt acts performed in pursuance of the conspiracy. Moreover, each of the events submitted to the jury as overt acts done in furtherance of the conspiracy would support a finding of guilt if the jury believed the government's evidence. By meeting with the agents and offering to contact Yepez in order to ameliorate the negotiations in July 1971, by dispatching Wright to pick up the cocaine, and by volunteering to organize a meeting in February 1974, the appellant acted in furtherance of the conspiracy.

We find other alleged errors, which the appellant asserts, to be without merit.

Affirmed.