UNITED STATES of America,
Plaintiff-Appellee,

v.

R. William HABEL and Frank R. Carcaise, Defendants-Appellants.

No. 78–5606.

United States Court of Appeals,
Fifth Circuit.

March 19, 1980.

James E. Shepherd, (court-appointed), Orlando, Fla., for R. William Habel.

Daniel S. Pearson, Miami, Fla., for Frank Carcaise.

Stephen P. Learned, Atty., Washington, D. C., Robert C. Weaver, Portland, Or., for plaintiff-appellee.

Before CHARLES CLARK, RONEY and HENDERSON, Circuit Judges.

HENDERSON, Circuit Judge.

In June, 1972, LTP Properties (LTP) began a Florida residential development called "the Swallows". LTP obtained most of the funds for the project from investors contacted through SEI, Inc. (SEI), a mortgage brokerage company. Appellant Carcaise was president of LTP, Gateway Consultants Inc., and Foxview Golf and Country Club until May 1, 1973, when Carcaise became chairman of the board of directors of each and hired appellant Habel as president.

In February, 1973, Carcaise furnished to SEI sales materials indicating that all money received from investors would be used to develop the Swallows. The investors, most of whom were elderly or disabled, bought promissory notes purportedly secured by first mortgages on residential lots (in fact 85% of the lots were encumbered by prior liens, mortgages or leases). Approximately five hundred investors purchased $6,250,000 of LTP securities, and they were told their mortgages were "free, clear and unencumbered" for residential lots, with streets and sewers provided. In reality, the assigned lots covered LTP's entire tract, with nothing retained for roads and sewers, and many lots were located under water or on the sites of a sewage treatment plant and a proposed golf course. The notes and deeds the investors received were signed by either Carcaise or Habel. The notes yielded one percent interest per month. No interest was paid after November, 1974.

At first LTP used investor funds to release a bank mortgage on a given lot so that an investor's mortgages could be cleanly recorded, but after January, 1974, LTP no longer secured releases prior to recording investor mortgages. Subsequently LTP recorded almost three hundred "subordinate first mortgages."

County authorities did not approve a development plat for the Swallows, so substantial development never commenced. Most invested funds went toward the construction of the Foxview Club in Pennsylvania, or to the salaries of Carcaise and Habel, and only about one-quarter of the funds disbursed were used to develop the Swallows.

On January 23, 1974 Carcaise wrote to Habel and discussed switching the investor mortgages from the useless grid-parcels to proposed residential lots (allowing for streets, etc.). Letters signed by Habel, were mailed to investors asking them to return their mortgages so they could be "re-recorded" (hence "the re-record letters"). The letters contained maps with particular lots circled and labeled "this is your lot." In fact, no re-recording ever occurred. In March and April, 1974, apology letters, also signed by Habel, were sent to the investors, wherein the delay in sending the new mortgages was falsely attributed to the press of other work. In September, 1974, LTP issued a "Swallows Newsletter," which had been prepared by a

public relations firm from information provided by Carcaise and Habel. The newsletter misled investors by stating that condominium construction was expected to begin presently.

In the spring of 1974, Carcaise told an assistant that he was worried that Habel might report the scheme to law enforcement authorities. Soon thereafter Habel resigned, although he continued to receive his salary until October, 1974. There was evidence that Carcaise continued to pay Habel in order to keep him quiet, but Habel maintains he had a right to the salary under his employment contract. Other·employees testified that Carcaise had told them not to discuss company business with Habel without first obtaining his approval.

Carcaise was convicted of 35 counts of mail fraud (18 U.S.C.A. § 1341) and one count of conspiracy (18 U.S.C.A. § 371). Habel was convicted of conspiracy and fifteen counts of mail fraud, all the substantive counts stemming from the re-record and apology letters.

Habel urges that the evidence adduced at his trial was insufficient to support his convictions. We have examined all the evidence and find that it was sufficient to support each part of the verdict, and we affirm his convictions.

◼ In reaching our conclusion, we have considered the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), with all reasonable inferences supporting the verdict accepted as true, *United States v. Wentland,* 582 F.2d 1022 (5th Cir. 1978), *cert. denied,* 439 U.S. 1133, 99 S.Ct. 1056, 59 L.Ed.2d 96 (1979); *United States v. James,* 576 F.2d 1121 (5th Cir. 1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); *United States v. Parr,* 516 F.2d 458 (5th Cir. 1975). The standard by which we review the sufficiency of the evidence supporting a criminal conviction is found in *United States v. Littrell,* 574 F.2d 828 (5th Cir.), "[O]ur inquiry

is whether the jury could reasonably, logically, and legally infer from the evidence presented that [the defendant] was guilty beyond a reasonable doubt. . . . Put another way, could the jury reasonably find that the evidence was inconsistent with every hypothesis of innocence? . . . A third formulation is whether the jury 'could not reasonably conclude that the evidence fails to exclude every reasonable hypothesis but that of guilt.'" 574 F.2d at 832, and n.3.

◼ In order to prove violations of the substantive counts, the government was required to show that Habel, in furtherance of a scheme to defraud, mailed letters knowing they contained untrue statements. *United States v. Amrep,* 560 F.2d 539 (2d Cir. 1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978); *United States v. LaFerriere,* 546 F.2d 182 (5th Cir. 1977). As the brief summary above shows, there was ample evidence that Habel was closely connected with the mailing of the re-record and apology letters, which were for all purposes, entirely false. The jury could well have concluded that Habel sent the letters as part of a scheme to defraud. Similarly, there was sufficient evidence to show a conspiracy existed, and that Habel knowing and freely joined it. While a person is not guilty of conspiracy simply because he knows a conspirator, there was substantial evidence, some of it direct, that Habel took part in the conspiracy. It was for the jury, of course, to decide what testimony to believe and what to reject.

◼ This analysis is adequate to a conventional attack on the sufficiency of the evidence, but Habel's argument is not conventional—in fact it is difficult to divine what his argument is. At the trial, the district judge granted a directed judgment of acquittal as to other defendants, and Habel complains it would be unjust to sustain his convictions on the same counts. However, even if there are circumstances in which a directed verdict as to some defend-

ants will require the same treatment for others, Habel's argument depends upon the truth of his assertion that he was no more involved with the apology and re-record letters than were the dismissed defendants. He signed these letters though, and it was properly left to the jury to decide whether his involvement fell to the level of guilt.

■ Habel also insists that the re-record and apology letters do not conclusively establish guilt. He reasons that the evidence "simply demonstrated that Mr. Habel forwarded, over his signature, [the re-record and apology] letters which had been prepared by others within the corporation," and that "[h]ad these letters been part of a scheme to defraud, there would have been no letters because as long as the investors continued to receive their one percent interests per month, as they were receiving at the time these letters were written, there would be no reason for the investors to become concerned and no reason for lulling." The mailing of letters "designed to lull [victims] into a false sense of security, [and to] postpone inquiries or complaints" constitutes mail fraud. *United States v. Ashdown*, 509 F.2d 793, 800 (5th Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975). While the jury might have accepted Habel's argument, it is no surprise that it did not; "the evidence shows that at the time the re-recording letters went out, the investors' security was worthless. Thus, the scheme could continue only as long as the investors were lulled into believing otherwise and prevented from warning other investors." Brief for Appellee at 42 n. 14. We do not reverse a conviction merely because the jury rejected counsel's rather weak assertions.

We now turn to the case of Carcaise, who concedes the evidence against him was sufficient to support his convictions but urges that errors in the conduct of the trial require reversal. His contentions are without merit, and we affirm.

■ First, the exclusion of certain evidence offered to show Carcaise intended to complete the Swallows was not an error, nor was the rejection of expert testimony that 1974 was a bad year for real estate developers.

The government did not contend that Carcaise intended to abandon the Swallows, but rather that Carcaise knowingly misrepresented material facts to his investors, thereby causing them injury. In closing argument, the prosecutor went so far as to say "[i]t is not charged in the indictment, and at no point in the government's case did we try to suggest to you or through the evidence that the defendants did not intend to build the Swallows." Carcaise asks us to find, from a selective examination of the indictment, that the government alleged he never intended to complete the project, but a fair reading shows this is not the case.

Carcaise admits that proof that he intended to complete the venture would not excuse knowing misrepresentations to investors. *United States v. Diamond*, 430 F.2d 688 (5th Cir. 1970). He only says the testimony might have convinced the jury of his good faith. The court instructed the jury that Carcaise's good faith intention to complete the project, while not a complete defense, could be considered on the question of his intent to defraud. Carcaise was permitted to introduce some evidence of his intent to complete the project, such as testimony about his attempts to obtain financing for the project.

■ The trial judge excluded the testimony of Dr. Halbert Smith, who would have testified that the interest rate offered on the notes was not high in view of the circumstances of the development, and that in 1974 interest rates rose and housing demand fell, resulting in the failure of many real estate developments. The testimony was properly rejected, since it was not relevant, and might have confused the jury. Although Dr. Smith was qualified to explain the effect of the 1974 recession on the housing industry in general, his proffered testimony did not indicate that he had any-

thing to say about the effect of the recession on the Swallows project in particular.

█ Carol Wollesen was personal secretary to Carcaise from December, 1973, until February, 1975. Carcaise claims that he was injured by a co-defendant's cross examination of Ms. Wollesen, who was a government witness. Ms. Wollesen's testimony on direct examination was indeed damaging to Carcaise. She identified numerous incriminating documents, and recalled telephone conversations implicating Carcaise and others. She testified that Carcaise told her to destroy certain records he wanted to keep from Securities and Exchange Commission investigators, as well as checks that documented his involvement in a sordid relationship. She further stated that Carcaise threatened he would get even if she ever testified against him.

After cross-examination by attorneys for several co-defendants, including Carcaise, counsel for defendant Stepanian requested a bench conference. (The court subsequently entered a judgment of acquittal for Stepanian.) Outside the presence of the jury and Ms. Wollesen, Stepanian's counsel said "Your Honor, I propose to examine this lady for purposes of attacking her credibility showing she had such a deep hatred for Frank Carcaise that she will say anything in order to make trouble for him," and, hence, for Stepanian. He told the trial judge, in the presence of Carcaise's attorney, that he intended to ask Ms. Wollesen whether she had previously stated that Carcaise kept a mistress, had a drinking problem, had a homosexual relationship with Stepanian, beat his wife, mistreated his children, had threatened her with violence when she left her job, and had bribed the federal judge presiding in a previous crimi-

nal prosecution. Ms. Wollesen had made most of these allegations during the course of a deposition previously taken by Carcaise's attorney. The judge asked Stepanian's counsel whether he had evidence that Ms. Wollesen had made these accusations, and he said he did, referring to the deposition.

Only the prosecutor asked the judge to rule out entirely this cross-examination. He contended there was insufficient

> predicate for cross-examining anybody until you show that she has somehow adopted that statement [about homosexuality] or until you can show that she made that statement. I think that is probably true of a very wide range of matters to which Mr. Dittmar has alluded. I would further tender to the Court there is absolutely no showing at this point that this woman has animus of that nature for Frank Carcaise or any showing whatsoever that spills over to anybody else.

The prosecutor further insisted that while Ms. Wollesen's testimony was damaging to all defendants, it was purportedly based on statements made by Carcaise, and he suggested that if she was motivated by ill-will she would have attributed fabricated statements to Stepanian and the other defendants. He concluded by saying "[t]hat is just not the nature of her testimony. If Your Honor wants some kind of proffer I think we can show by and large these aren't her statements."

Following this objection from the government, the lead counsel for Carcaise asked to make "one brief comment." He then said that mention of the earlier federal trial in Atlanta would be unduly damaging and of only limited relevance.[1] The court then

---

1. Carcaise's appellate counsel maintains that the trial lawyer made the same argument that he makes here, but this is not true. The only objection at the trial was on the bribery allegation, and that objection was sustained. We include excerpts from the transcript, quoting in full counsel's objection.

"May I make one brief comment? . . . And that is simply this, I think the grounds that have been previously advanced by the various parties that have moved for severance, and in particular Mr. Stepanian, was on the ground, vis-a-vis, of inconsistent defenses.

"I don't challenge for one minute his right to challenge by all available means within the

instructed Stepanian's attorney not to discuss the acquittal in Atlanta, saying "I don't think that is sufficiently probative of credibility that it is worth the detriment to Mr. Carcaise." The trial judge then said he would not otherwise restrict cross-examination, but would address objections to specific questions when raised.

Under cross-examination, Ms. Wollesen denied any animosity toward Carcaise, but admitted that during her deposition she had said Carcaise "was never home. When he was home he was drunk and it was 'shut up and get out of my way.' He never had a good word to say to [his children]." She admitted she had sworn that Carcaise beat his wife and kept a mistress. When asked "Have you stated that Mr. Carcaise threatened you with physical harm when you quit?", she answered "Yes, he did." Stepanian's lawyer then asked "You stated all these things yet you say you bear no animosity towards him?", and she responded "I bear no animosity towards him, that is not animosity, that is the truth." She subsequently answered that she had never said she suspected Carcaise of having homosexual relationships, but that someone else had suggested this to her.

Carcaise now complains that the cross-examination testimony was so scandalous his convictions are invalid, or, alternatively, that the trial judge erred in failing to grant a severance, or at least an instruction as to the limited purpose of the testimony.

 Since Carcaise's single objection was sustained, his convictions should be af-

firmed unless Ms. Wollesen's testimony so prejudiced him that its admission constituted plain error. F.R.Crim.P. 51, 52. Plain error will be found only in exceptional circumstances, *United States v. King,* 505 F.2d 602 (5th Cir. 1974), especially when a timely objection would have enabled the trial court to prevent an injustice, *Fallen v. United States,* 343 F.2d 844, 846 (5th Cir. 1965); *cf. United States v. Garber,* 471 F.2d 212 (5th Cir. 1972). We determine that neither the admission of Ms. Wollesen's testimony nor the district court's failure to grant a severance or issue a limiting instruction constitutes plain error.

 It is apparent that Carcaise's attorney chose to forego objections for tactical reasons. Counsel for Carcaise was attentive throughout trial, and we may assume he concluded, as did Stepanian's lawyer, that the injurious impact of the repetition of the contents of Ms. Wollesen's deposition would be outweighed by its value as evidence of her bias against Carcaise.[2] We cannot know whether his judgment was correct, but, unfortunately for him, we know the jury accepted the government's version of the facts. When a lawyer, for strategic reasons, chooses to by-pass the appropriate procedures for informing the trial court of contemporaneous errors, he will not be heard to complain when his strategy backfires. *Henry v. Mississippi,* 379 U.S. 443, 450, 85 S.Ct. 564, 568, 13 L.Ed.2d 408, 414 (1965); *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837, 869

---

limits of propriety the credibility of this witness.

"On the other hand, though, I don't think that going into the issue of the Georgia trial is something that properly can be utilized to test her credibility because it injects this prejudicial material about Mr. Carcaise that is not even relevant in the first instance. So, I don't think it is admissible and it can't be used to test her credibility.

"I think that, from what I see, and it goes without saying, that Mr. Stepanian through his attorney, Mr. Dittmar, they want a severance in the worst way, and I think that if this is what it is being offered for, then, I think it misses the mark of inconsistent defenses which is what has been stated before.

"And I just would point out to the court that I would like to have some assurance that the questions propounded along the lines of the Georgia case, regardless of the facts of the acquittal or the speculation of the witnesses about how it was obtained, that those areas not be allowed to be inquired into."
Transcript at 1992–93.

2. The jury had already heard testimony that Carcaise kept a mistress. Stepanian's counsel risked having Wollesen testify that she had previously said Carcaise and Stepanian were having a homosexual relationship.

(1963). This is especially true where the strategy is to remain quiet during the trial in hope of a favorable verdict, but, when that fails to materialize, to resort "to appeal on errors that might have easily been corrected by objection at trial." *United States v. Jacquillon,* 469 F.2d 380, 386 (5th Cir. 1972), *cert. denied,* 410 U.S. 938, 93 S.Ct. 1400, 35 L.Ed.2d 604 (1973); *United States v. Sisto,* 534 F.2d 616 (5th Cir. 1976); *United States v. Crockett,* 534 F.2d 589 (5th Cir. 1976).

Similarly, when Carcaise's counsel objected to cross-examination about the previous Atlanta prosecution, he indicated severance would be inappropriate, and he cannot argue otherwise now. *See* note 1, *supra.* Nor did he request a curative instruction, and the trial court was entitled to conclude that Carcaise did not want to draw attention to the testimony. *United States v. Avarello,* 592 F.2d 1339, 1346 (5th Cir. 1979), U.S. appeal pending; *United States v. Kohne,* 358 F.Supp. 1053, 1062 (W.D.Pa. 1973), *affirmed,* 485 F.2d 682, 487 F.2d 1395, *cert. denied,* 417 U.S. 918, 94 S.Ct. 2624, 41 L.Ed.2d 224 (1974); *United States v. Stallings,* 273 F.2d 740, 741 (2d Cir. 1960).

■ Finally, Carcaise objects to the jury charge. Throughout trial he insisted that he was confident that the Swallows would succeed. The jury was instructed that good faith was relevant to guilt or innocence, but would not "justify false or reckless representations or promises." While we would hesitate to uphold the imposition of criminal sanctions for mere recklessness, this is a correct instruction. *United States v. England,* 480 F.2d 1266, 1269 (5th Cir.), *cert. denied,* 414 U.S. 1041, 94 S.Ct. 543, 38 L.Ed.2d 332 (1973); *United States v. Frick,* 588 F.2d 531, 536 (5th Cir. 1979), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 385 (1979). Reviewing the charge as a

whole, we find it fair; the jury was told the defendants were not guilty unless they "knowingly and intentionally attempted to deceive another."

■ Carcaise was convicted on several counts because he had represented that he was selling first mortgages, when in fact, this was untrue. The trial court excluded expert testimony on the Florida law of mortgages, and instructed the jury on the meaning, under Florida law, of the terms "mortgage," "first mortgage," "lien" and "encumbrance." The judge then quoted a portion of the mortgage that Carcaise mailed investors,[3] and said that such language was a representation that it was a first mortgage and that there were no other encumbrances. Since this was an accurate statement of the law, the instruction was free from error.

The convictions are AFFIRMED.

---

3. This portion of the instruction, which follows, quotes the mortgages: "Mortgagor hereby covenants that mortgagor is well and truly ceased [sic] of a good and perfect title to the premises above conveyed in the law, in fee simple, and has good rights and lawful authority to convey the same, and that the title so conveyed is clear, free and unencumbered and the mortgagor will forever warrant and defend the same to mortgagee against all claims whatsoever."