UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles L. RODGERS, Anthony J. Bertucci Construction Co., Inc., Mack A. Mathis, Alois Luhr and Luhr Bros., Inc., Defendants-Appellants.

No. 79–5381.

United States Court of Appeals,
Fifth Circuit.

Aug. 27, 1980.

Rehearing and Rehearing En Banc
Denied Oct. 10, 1980.

Jacques F. Bezou, Milton E. Brener, New Orleans, La., for Rodgers.

Francis G. Weller, New Orleans, La., for Bertucci.

John R. Martzell, New Orleans, La., for Mathis.

Bruce C. Rohde, Omaha, Neb., for Luhr & Luhr Bros.

Robert B. Nicholson, J. Mark Manner, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before THORNBERRY, FRANK M. JOHNSON, Jr., and HENDERSON, Circuit Judges.

FRANK M. JOHNSON, Jr., Circuit Judge:

Defendants Alois Luhr, Mack A. Mathis, Charles Rodgers, Anthony J. Bertucci Construction Company (Bertucci Co.), and Luhr Brothers, Inc. (Luhr Bros.) [1] appeal multiple convictions of mail fraud, 18 U.S.C. § 1341,[2] and of making false statements to a federal agency, 18 U.S.C. § 1001.[3] Appellants' challenge is both vigorous and multipronged. Nevertheless, careful examination of applicable legal authority and of a voluminous record composed of nearly five thousand nine hundred pages convinces us that the contentions of defendants are insufficient to justify our disturbing their convictions. Accordingly, we affirm.

The prosecution arose from a comprehensive investigation conducted by the Antitrust Division of the United States Department of Justice into the practices of the river construction industry of the Mississippi River and its major tributaries. On September 27, 1978, a grand jury of the Eastern District of Louisiana indicted much of that industry—ten individuals and sixteen corporations. The indictment charged one count of conspiracy to restrain competition in violation of the Sherman Act,[4] twenty-nine counts of mail fraud, and twenty-four counts of false statement.[5] The charges related to an alleged bid-rigging scheme carried out by the industry between 1964 and 1978 for the allocation of river bank stabilization projects [6] awarded by the United States Army Corps of Engineers (Corps).[7]

1. At times relevant to the case defendant Luhr served as president of Luhr Bros. and Mathis as president of Bertucci Co. Rodgers was former president of Markham and Brown Co., an indicted defendant that did not go to trial.

2. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
18 U.S.C. § 1341.

3. Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1001.

4. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ." 15 U.S.C. § 1.

5. An aiding and abetting count also accompanied each substantive mail fraud and false statement charge. See 18 U.S.C. § 2.

6. Bank stabilization projects involve the construction or repair of structures that help channel the flow of a river to protect the river banks from erosion. These structures include: 1) revetments constructed of stone, piling, or concrete that are usually parallel to the river channel and hold it in a fixed position and thereby protect the bank; 2) dykes that are generally built of rock or some other material and project out into the channel at right angles to the bank. Dykes move the flow of water away from the eroding bank; 3) jetties, which project beyond the bank line at the mouth of a river or stream to keep up the flow of the river so that it reaches deep water; and 4) foreshore protection which usually consists of large pieces of rock spread along the river bank.

7. Although the conspiracy in restraint of trade and the mail fraud scheme were alleged to have lasted from 1964 to 1978, the specific mail fraud and false statement counts were based on bids submitted by defendants or mailings sent by the Corps of Engineers regarding five bank

The district court severed the Sherman Act count and, on May 14, 1979, the remaining counts came to trial. The jury found each of the defendants who elected to stand trial [8] guilty on all counts charged.[9]

## I. MAIL FRAUD

"The mail fraud statute, 18 U.S.C. § 1341, condemns any scheme to defraud in which the mails are used." *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980). In order to convict of mail fraud, the prosecution must establish beyond a reasonable doubt three elements: "(1) defendants' participation in a 'scheme or artifice to defraud,' . . .; (2) use of the mails 'caused' by someone associated with the scheme, . . .; and (3) use of the mails 'for the purpose of executing the scheme.'" *United States v. Knight*, 607 F.2d 1172, 1175 (5th Cir. 1979) (citations omitted); *e. g., United States v. Kent*, 608 F.2d 542, 545 (5th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980); *United States v. Zicree*, 605 F.2d 1381, 1384 (5th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). On appeal defendants challenge the sufficiency of the evidence of all three elements. They assert that the proof at trial established not the one scheme to defraud that was charged in the indictment but rather multiple schemes; that the evidence did not support the jury's conclusion that each defendant participated in the scheme; and that the mailings upon which the mail fraud charges were brought were made after the scheme had ended and therefore were not "caused" by the scheme or "for the purpose" of its execution.

Our task on review is to determine "'whether the jury could reasonably, logically, and legally infer from the evidence presented that [the defendants were] guilty beyond a reasonable doubt. . . . Put another way, could the jury reasonably find that the evidence was inconsistent with every hypothesis of innocence?'" *United States v. Habel*, 613 F.2d 1321, 1324 (5th Cir. 1980) [*quoting United States v. Littrell*, 574 F.2d 828, 832 & n. 3 (5th Cir. 1978)]. Of course, in making this determination we consider the evidence in the light most favorable to the government with all reasonable inferences drawn in support of the verdict. *Hamling v. United States*, 418 U.S.

---

stabilization projects awarded in 1976 by the New Orleans Corps district: three Emergency Foreshore Protection jobs, the Southwest Pass job, and the Hadden-Ft. DeRussy job. All defendants were named in Count 1 alleging a conspiracy in restraint of trade. The mail fraud and false statement counts, however, charged various defendants.

8. Of the twenty-six individuals and corporations indicted, nineteen entered pleas of guilty or *nolo contendere*.

9. W. Kent Ford and Ford Construction Company were convicted of ten counts of mail fraud relating to the First (Counts 2–4), Second (Counts 5–8), and Third (Counts 9–11) Emergency Foreshore protection jobs. Both were also convicted of making false statements with respect to the three stabilization projects (Counts 32, 37, 43). Ford and his company each received the maximum fine of $40,000—$1,000 for each mail fraud count and $10,000 for each false statement count—and Kent Ford was also sentenced to concurrent suspended three-year prison terms on each count. Neither Ford nor the company appeals.

Alois Luhr and Luhr Bros. were each convicted of twenty-eight mail fraud counts relating to the three Foreshore jobs (Counts 2–4, 5–8, 9– 11) and the Hadden-Ft. DeRussy job (Counts 13–30) and of two counts of making false statements on bids submitted on the Southwest Pass job (Count 48) and on the Hadden-Ft. DeRussy job (Count 51). Luhr Bros. and Alois Luhr were each assessed the maximum fine, $48,000, and Alois Luhr also received concurrent three-year suspended sentences.

Mack Mathis and Bertucci were each convicted of the ten mail fraud counts (Counts 2–11) relating to the Emergency Foreshore jobs and four false statement counts relating to bids submitted on the Foreshore jobs (Counts 31, 36, 42) and on the Southwest Pass job (Count 47). Again, both received the maximum fines and Mathis was given concurrent three-year suspended sentences.

Charles L. Rodgers was found guilty on the same twenty-eight mail fraud counts of which Luhr and Luhr Bros. were convicted and on three false statement counts relating to bids on the Foreshore jobs (Counts 33, 38, 44). He was assessed concurrent three-year suspended sentences and fined $14,500—$250 for each mail fraud count and $2,500 for each false statement count.

87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Habel, supra*, 613 F.2d at 1324; *United States v. Wentland*, 582 F.2d 1022, 1026 (5th Cir. 1978), *cert. denied*, 439 U.S. 1133, 99 S.Ct. 1056, 59 L.Ed.2d 96 (1979).

We conclude that the government met its burden of proof and the jury properly exercised its role. The convictions, therefore, must stand.

### A. Scheme or Schemes

■ Relying upon the applicability of conspiracy law principles to mail fraud prosecutions, *see United States v. Freeman*, 619 F.2d 1112, 1123 (5th Cir. 1980); *United States v. Toney*, 598 F.2d 1349, 1355 (5th Cir. 1979), *cert. denied*, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980); *United States v. Krohn*, 573 F.2d 1382, 1386 (10th Cir.), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978); *United States v. AMREP Corp.*, 560 F.2d 539, 545 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978); *United States v. Perkal*, 530 F.2d 604, 606 (4th Cir.), *cert. denied*, 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 82 (1976); *United States v. Cohen*, 516 F.2d 1358, 1364 (8th Cir. 1975); *United States v. Wilson*, 506 F.2d 1252, 1257 (7th Cir. 1974); *United States v. Joyce*, 499 F.2d 9, 16–17 (7th Cir.), *cert. denied*, 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974), defendants contend that the evidence adduced at trial indicated the existence of multiple, isolated schemes and not the single scheme charged in the indictment. Accordingly, appellants urge that they suffered from a prejudicial "variance" between the indictment and proof at trial within the doctrine of *Kotteakos v. United States*, 328 U.S. 750, 772–73, 66 S.Ct. 1239, 1251–1252, 90 L.Ed. 1557 (1945). The jury properly could have con-

cluded that the defendants were involved in several and not one scheme to defraud, *United States v. Thomas*, 586 F.2d 123, 132 (9th Cir. 1978); *United States v. Becker*, 569 F.2d 951, 961 (5th Cir.), *cert. denied*, 439 U.S. 865, 1048, 99 S.Ct. 188, 726, 58 L.Ed.2d 174 (1978); *United States v. Rodriguez*, 509 F.2d 1342, 1348 (5th Cir. 1975). However, it did not.

The present case is not one in which the indictment itself charged several criminal agreements. *See United States v. Bowline*, 593 F.2d 944, 946 (10th Cir. 1979). Neither is it one in which no evidence was presented that would indicate a common criminal plan or agreement. *See United States v. Fuel*, 583 F.2d 978, 981 (8th Cir. 1978), *cert. denied*, 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979). Rather, the indictment charged a scheme to defraud that continued from 1964 to 1978. Moreover, the evidence clearly supported the conclusion of a single scheme with a common goal, operations carried out in virtually identical manner, and an overlapping of participants. *United States v. Becker, supra*, 569 F.2d at 960. The presence of these factors is more than sufficient to refute defendants' argument of a prejudicial variance.

The evidence presented at trial indicated a long-running scheme designed to circumvent competitive bidding procedures of the Corps of Engineers[10] by "arranging" bids in order to allocate the river construction work. The government's principal witnesses were four river contractors[11] who testified in detail regarding pre-bid allocation meetings over a period of years and in a number of cities including Omaha, Kansas City, St. Louis, Memphis, Vicksburg, and New Orleans. The operation of the scheme remained consistent over the years; through face-to-face meetings or telephone conversations the river contractors would collectively agree on who would be awarded

---

10. *See* 10 U.S.C. §§ 2303(a), 2304; Armed Services Procurement Regulation ¶ 1–115, *reprinted in* 32 C.F.R. at 1:14 (1979); 33 C.F.R. § 210 (1979).

11. Participants in the scheme who testified at trial were Bart Tully, president of the Patton-

Tully Transportation Co. of Memphis, Tennessee; Wallace McGeorge and Don Boling of Pine Bluff Sand & Gravel Co. of Pine Bluff, Arkansas; and John T. Massman of Massman Construction Co. and Pensacola Construction Co. of the Kansas City area.

the Corps jobs. The other co-schemers were then given prices "to clear" or "to protect" and either submitted complementary bids or did not bid at all. The common goal, to allocate Corps of Engineers river construction work, also remained constant.

Participants in individual aspects of the scheme over the years varied to some extent. Overall, however, there remained a high level of commonality. Defendant Luhr was placed at the center of the scheme from beginning to end and throughout the geographical area involved in the case. The government's first witness, Mr. Tully, testified that Luhr participated in allocation meetings in Kansas City in 1964, in Kansas City and Omaha in 1975 and 1976, in Memphis in 1973, and in New Orleans in 1976. According to Tully, Rodgers also attended meetings in Kansas City and New Orleans in 1976. Similarly, defendant Mathis was involved in allocation discussions in Memphis, Vicksburg, and New Orleans.

Defendants also assert that even if the evidence was sufficient to support a finding of one scheme, because the question was for the jury, *see United States v. Becker, supra,* 569 F.2d at 961; *United States v. Rodriguez, supra,* 509 F.2d at 1348, the court committed reversible error in refusing to charge the jury specifically on the possibility of finding multiple schemes. We disagree. While such an instruction may be "good" practice, *United States v. Levine,* 569 F.2d 1175, 1178 n.6 (1st Cir.), *cert. denied,* 436 U.S. 928, 98 S.Ct. 2824, 56 L.Ed.2d 771 (1978), prior decisions of this Court in no way require a finding of reversible error when such a charge is not given. In charging the jury the court carefully instructed that no individual could be found guilty of mail fraud unless the government proved

beyond a reasonable doubt that he "knowingly and willfully devised or intended to devise or joined a scheme to defraud *substantially the same as the one alleged in the indictment.*" (Emphasis added). As stated by the Court of Appeals for the Tenth Circuit when faced with the precise question in *United States v. Watson,* 594 F.2d 1330, 1340 (10th Cir. 1979), *cert. denied,* 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1980), "[w]e feel that the instructions as a whole adequately covered the question . . . . [I]t was not error to refuse the requested instruction concerning multiple conspiracies." *See also United States v. Freeman, supra* at 1118.

**B.** *Individual Participation in the Scheme* [12]

i. Luhr and Luhr Bros.

■ Defendants Luhr and his company argue that even though evidence of participation in the scheme in earlier years may be overwhelming, they cannot be convicted of mail fraud regarding the 1976 New Orleans Corps district Emergency Foreshore jobs or the Hadden-Ft. DeRussy job. The argument is meritless. Luhr's active participation in the scheme from the beginning is amply demonstrated by the record. That alone would be sufficient to sustain the mail fraud convictions against him and Luhr Bros. If the scheme is accountable for the mailings for which Luhr is charged, so long as Luhr retains membership in the scheme his conviction is not proscribed. It is "well settled in this circuit" that co-schemers are jointly responsible for each other's acts in furtherance of the scheme. *United States v. Toney, supra,* 598 F.2d at 1355; *see United States v. AMREP Corp., supra,* 560 F.2d at 545; [13] *United States v. Cohen, supra,* 516 F.2d at 1364; [14] *United*

---

**12.** Defendant Rodgers does not challenge the sufficiency of the evidence of his participation in the scheme.

**13.** "So long as a transaction is within the general scope of a scheme on which all defendants had embarked, a defendant not directly connected with a particular fraudulent act is nonetheless responsible therefor if it was of the kind

as to which all parties had agreed." 560 F.2d at 545.

**14.** "An individual participant in a mail fraud scheme will be held liable for the acts of his agents and co-schemers that are within the general scope of the scheme (citation omitted) unless as in a conspiracy, he undertakes some affirmative act of withdrawal." 516 F.2d at 1364.

States v. Wilson, supra, 506 F.2d at 1257;[15] United States v. Joyce, supra, 499 F.2d at 16. The record, however, affirmatively demonstrates Luhr's participation in the division of the Foreshore and Hadden-Ft. DeRussy jobs. Witness McGeorge testified to Luhr's involvement in arranging the allocation of the Foreshore jobs and Mr. Tully and Mr. Massman both testified that Luhr participated in a meeting in Vicksburg to discuss various jobs, including Hadden-Ft. DeRussy. The job was allocated to Massman and he stated that Luhr submitted a complementary bid.

ii. Mathis and Bertucci Co.

Mathis admits that he was present at the comprehensive allocation meeting for 1973 held in Memphis and he concedes that the issue of his participation in the meeting or in the arrangements achieved at the meeting was for the jury to decide. Similarly, the participation of Mathis in attempts to allocate the Southwest Pass job is not seriously in dispute. Mr. Tully and Mr. Boling both testified that Mathis attended an allocation meeting for that job and argued vigorously that his Bertucci Co. was entitled to the entire contract. Nevertheless, he urges that his convictions for mail fraud in connection with the 1976 Foreshore jobs are not supportable. As with Luhr, absent evidence that Mathis withdrew from the scheme, no additional evidence is required to support his conviction of mail fraud on the Foreshore jobs. But also as with Luhr, independent evidence supports Mathis' mail fraud convictions. Witness McGeorge placed Mathis in Mr. Ford's room where the allocation of the Foreshore jobs was worked out. Moreover, Mr. Tully testified that co-schemer Ford had indicated the involvement of Mathis in the decision on the Foreshore jobs, see United States v. Freeman,

supra, at 1123, and Bertucci Co. did obtain part of the Foreshore work.[16]

C. *Relationship of the Scheme and the Mailings*

The mailings charged as the basis of the mail fraud counts were sent by the Corps of Engineers to contractors who obtained the allocated work. These mailings were of two types: "notices to proceed," sent to instruct a contractor to commence construction on a project; and checks in payment for work being completed. Luhr argues at great length that these mailings, as a matter of law, were not sufficiently related to the scheme to defraud in order to support the convictions and, further, that the scheme did not "cause" those mailings. Luhr's contentions are misplaced.

The crux of Luhr's argument appears to be that the scheme to defraud encompassed only the allocation of Corps construction projects. According to Luhr, because the mailings were based on "acts of contract performance" in accordance with contract specifications, those mailings were not a proper basis for mail fraud prosecution.

There is no requirement of a "but for" relationship between use of the mails and execution of the scheme to defraud in order for a mailing to be "in furtherance" of the scheme. *United States v. Knight, supra*, 607 F.2d at 1175; *United States v. Buchanan*, 544 F.2d 1322, 1325 (5th Cir.), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1977). As this Court stated in *United States v. Knight*,

It is well settled that use of the mails will support a mail fraud conviction if it is "incident to an essential part of the scheme." *Pereira v. United States* [347 U.S. 1, 8 , 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954)]; *United States v. Shryock*, 537

---

15. "In a prosecution for mail fraud, once agreement to a scheme has been adequately established, any party to the agreement is responsible for the acts and declarations of another party in furtherance of the common scheme . . . ." 506 F.2d at 1257.

16. Mathis also contends that he was prejudiced by the admission against him of evidence concerning allocation of the Foreshore jobs and, therefore, the court erred in denying his motions for severance and new trial. However, Mathis' participation in the general scheme and in the division of the Foreshore jobs was established. We perceive no prejudice to Mathis and certainly no abuse of discretion in the denial of his motions.

F.2d 207, 209 (5th Cir. 1976), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977); *United States v. Shepherd,* 511 F.2d 119, 122 (5th Cir. 1975). The mail must be used *"'in employing the scheme however incidental the mailings may be.'"* *United States v. Ashdown,* 509 F.2d 793, 799 (5th Cir.), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (l975), *quoting United States v. Schaefer,* 299 F.2d 625, 630 (7th Cir. 1962) (emphasis in *Schaefer*).

607 F.2d at 1175.

■ It is true that the scheme to defraud did not concern the performance of the contract work itself. Rather the scheme primarily involved the allocation of the contractors to perform that work. Nevertheless, the scheme defrauded the government of its right to depend upon the competitive process to allocate the jobs and to set the cost of those jobs. The scheme would have been meaningless, incomplete, and futile without final award and payment which were accomplished through the mail.

Clearly, the mails were used "in furtherance" of the scheme.[17]

## II. FALSE STATEMENTS

■ On each bid submitted to the Corps of Engineers on river construction work, the bidder makes certain certifications. Among the certificates on the bids submitted by scheme members was the following:

The prices in this bid have been arrived at independently, without consultation, communication, or agreement, for the purpose of restricting competition, as to any matter relating to such prices with any other bidder or with any competitor.[18]

■ Mathis and Luhr contend that because of an allegedly misplaced comma following "agreement," the certification quoted above literally meant not that the bid was independently made in order to protect competition but that "the prices in this bid have been independently arrived at for the

---

17. The determination that the mailings were closely enough related to the scheme to be "in furtherance" of its execution all but disposes of Luhr's contention that performance of the work rather than the members of the scheme "caused" the use of the mails. Luhr's brief itself quotes Supreme Court authority sufficient to lay the contention to rest.

> [O]ne "causes" the mails to be used where he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended . . . ."

*United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974) [*quoting Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1954)]; *United States v. Johnston,* 547 F.2d 282, 284 (5th Cir.), *cert. denied,* 431 U.S. 942, 97 S.Ct. 2660, 53 L.Ed.2d 261 (1977). Use of the mails in the ordinary course of business of the Corps of Engineers reasonably could have been anticipated by the co-schemers.

Defendant Rodgers urges somewhat confusingly that the mail fraud convictions must be reversed because, to defendants' prejudice, the government unnecessarily "piled" the mail fraud counts on top of an adequately alleged antitrust charge. As demonstrated above, the mail fraud convictions were sufficiently proved. Moreover, bid rigging schemes can be prosecuted simultaneously as Sherman Act and mail fraud violations. *See United States v. Azzarelli*

*Construction Co.,* 612 F.2d 292, 298 (7th Cir. 1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 3010, 65 L.Ed.2d —— (1980); *United States v. Brighton Building & Maintenance Co.,* 435 F.Supp. 222, 226, 229 (N.D.Ill.1977), *aff'd* 598 F.2d 1101 (7th Cir. 1979), *cert. denied,* 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1980). Even if identifiable prejudice would have resulted from such joint prosecution, in the present case the Sherman Act count was severed and defendants were tried and convicted only of mail fraud and of making false statements. Until defendants have been convicted of both mail fraud and antitrust violations, it is difficult to ascertain how they can claim to have suffered any harm.

18. The district court properly instructed the jury that in order to convict any defendant of making a false statement in violation of 18 U.S.C. § 1001, the burden rested upon the government to prove beyond a reasonable doubt that the defendant knowingly made a false statement on a matter within the jurisdiction of a federal agency or department, that the false statement related to a material matter, and that the defendant acted willfully with knowledge of the falsity of the statement. *See United States v. Lange,* 528 F.2d 1280, 1287 (5th Cir. 1976); *United States v. Smith,* 523 F.2d 771, 779 n.15 (5th Cir. 1975), *cert. denied,* 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976).

purpose of restricting competition . . ." Accordingly, although defendants admit making the statement, they contend that since the statement was not literally false it cannot serve to support the false statement convictions. Despite defendants' novel contention, the certification "fairly read," *United States v. Lange, supra*, 528 F.2d at 1288, stated that the bids were entered independently and not collusively. That statement was false and the defendants knew it.[19]

## III. OTHER CONTENTIONS

### A. *Prosecutorial Argument*

■ During her closing argument to the jury, one of the government attorneys referred to the mix-up between the co-schemers that occurred in relation to the Southwest Pass job. *See* note 19, *supra*. Although participants in the allocation meeting thought that they had reached an agreement that defendant Luhr and Mr. Tully would get the job, Mr. Rodgers apparently misunderstood and independently bid competitively on the project. His bid was nearly $500,000 below Luhr's and Rodgers' firm won the job. The prosecution focused on this fact to argue that the government had indeed been defrauded of money through the operation of the scheme.

Defendant Rodgers asserts that the argument was prejudicial and contrary to the evidence. We disagree. The trial court

correctly overruled defense objections to the prosecutor's observations because the argument was a reasonable inference drawn from the evidence.

### B. *Access to Witness*

■ Defendants also urge that they were denied their right to fair trial because their trial preparation was hindered due to the government obstructing access to potential witnesses. The issue arose because prosecutors suggested that Corps of Engineers employees speak with defense lawyers only if Justice Department or Corps lawyers were also present. The district court ordered the Corps to inform employees that if they wished, they were free to talk with the defense. Moreover, the court granted a two month continuance. Defendants interviewed all Corps employees who consented and several were listed as potential defense witnesses.[20]

Obstruction of access to witnesses is serious. However, the actions of the district court ameliorated any possible prejudice to the defendants. *See United States v. Clemones*, 577 F.2d 1247, 1252 (5th Cir. 1978). As in *Clemones*, defendants "have not demonstrated real, substantive impairment of their right to a fair trial." *Id.*

### C. *Change of Corporate Control*

■ The ownership and control of Bertucci Co. changed after September 11, 1976.

---

**19.** Luhr and Mathis and their companies also challenge the sufficiency of the evidence demonstrating that they submitted collusive bids. Luhr's false statement convictions related to bids submitted on the Hadden-Ft. DeRussy and Southwest Pass jobs. Evidence presented at trial indicated that Luhr attended a contractors' meeting in Vicksburg in June 1976 at which the allocation of the Hadden-Ft. DeRussy job, among others, was discussed. The job was allocated to Mr. Massman's Pensacola Construction Co. Massman stated that Luhr submitted a complementary bid. The meeting for the allocation of the Southwest Pass job was held in Luhr's hotel room in New Orleans. According to Mr. Tully and Mr. Boling, Luhr and several others argued for the job and the tentative agreement was that the work be awarded to Mr. Luhr and Mr. Tully. Defendant Rodgers, however, independently bid the Southwest Pass job—and won it. Later, Rodgers called Mr. Boling and was told that the job had been

allocated to Luhr and Tully. Rodgers spoke with Tully and apologized and pledged to remedy the problem. Both Mr. Tully's company and Mr. Luhr's received subcontracted work on the job. The evidence supports Luhr's false statement convictions.

As noted above, Mathis, too, was a party to the agreement thought by all of the participants, save Mr. Rodgers, to have been reached on the Southwest Pass job. Moreover, Mathis' participation on the Foreshore jobs was also discussed above in connection with the mail fraud counts. *See* note 16, *supra* and accompanying text. The evidence amply supports the jury's conclusion that, on the three Foreshore jobs and the Southwest Pass job, Mathis and Bertucci Co. submitted collusive bids.

**20.** Since the defendants rested following the prosecution's case, however, no Corps employees testified for defendants at trial.

The company asserts that this change in ownership precludes corporate criminal liability for offenses committed before September 1976. The argument lacks merit. Bertucci Co. was incorporated in 1968 in Louisiana and has maintained continuous existence since that time. Under Louisiana law:

> A corporation is an intellectual body; created by law, composed of individuals united under a common name, the members of which succeed each other, so that the body continues always the same, notwithstanding the change of individuals which [sic] compose it, and which for certain purposes, is considered as a natural person.

La.Civ.Code Ann. art. 427; *see* La.Rev.Stat. Ann. § 12:41(B)(2). No authority cited by Bertucci Co. indicates that it should be relieved of the criminal liability imposed upon it by the jury.

AFFIRMED.